# EXHIBIT 1

## CO-PROMTIONAL RIGHTS AGREEMENT

**THIS CO-PROMOTIONAL RIGHTS AGREEMENT** ("Agreement") is made and entered into as of this 2d day of June, 2017 by and among **SALITA PROMOTIONS CORP. ("SPC"),** a New York corporation, with offices at 5458 Claridge Lane, West Bloomfield, Michigan, 48322, **MILLER TIME PROMOTIONS, LLC d/b/a BIG BABY MILLER ("MTP")**, a Florida limited liability company, with offices at 600 South Dixie Highway, #151, West Palm Beach, Florida 33401 and **JARRELL MILLER ("FIGHTER").**

# RECITALS

A.   Fighter is a World ranked professional boxer who currently is promoted by Star of David, Inc., a New York corporation ("SDI") a wholly-owned subsidiary of SPC.

B.   SPC is licensed as a promoter by various States and Boxing Commissions in the United States of America and is currently active in the promotion of professional boxing events.

C.   Fighter and SDI entered into a Promotional Rights Agreement dated March 15, 2014. ("2014 Agreement").

D.   MTP is a new promotional company solely owned and operated by Fighter.

E.   Certain disputes have arisen between the parties which they desire to resolve by entering into this new Co-Promotional Rights Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the parties agree as follows:

1

## 1.  <u>Promotional Rights</u>.

1.1  Upon the full execution of this Agreement, SPC, MTP and Fighter, hereby mutually agree that this Agreement shall amend and replace the 2014 Agreement and that the 2014 Agreement is hereby terminated and shall have no further legal force or effect. The parties acknowledge and agree that Fighter and SDI are parties to that certain lawsuit pending in the Supreme Court of the State of New York, County of New York, Index No. 656445/2016 (the "Lawsuit").  Upon the full execution of this Agreement, SPC shall cause the Plaintiff in the Lawsuit and Fighter shall cause the Defendants in the Lawsuit, to be dismissed with prejudice as to all parties, each party to bear its, his or her own costs and attorneys' fees. The parties acknowledge and agree that SDI entered into that certain Co-Promotion Agreement (the "GCP Agreement") dated as of November 10, 2014 with Greg Cohen Promotions LLC ("GCP") pursuant to which SDI transferred to GCP one-half (50%) of SDI's promotional rights to Fighter under the 2014 Agreement.  The parties acknowledge and agree that this Agreement, in accordance with Section 2(b) of the GCP Agreement, identifies GCP as Fighter's co-promoter and acknowledges the rights heretofore granted to GCP by SDI under the GCP Agreement; provided, however, that the parties acknowledge that (i) Fighter only signed the 2014 Agreement with SDI, (ii) GCP is not a party to the 2014 Agreement, (iii) Fighter did not consent to or approve of SDI's assignment of 50% of SDI's promotional rights to GCP and (iv) Fighter owes no duties or obligations to GCP either under the 2014 Agreement or as a result of entering into this Agreement.  SPC represents to MTP and Fighter that prior to entering into this Agreement, SDI forwarded a copy of this Agreement to GCP so that GCP may review the terms which are material to GCP. SPC also covenants to Miller and MTP that SDI will provide GCP with a fully executed copy of this Agreement immediately upon signing.   Fighter and Miller acknowledge and agree that in accordance with Section 2(b) of the GCP Agreement, in the event that this Agreement contains terms unacceptable to GCP, then GCP shall have fifteen

(15) days from receipt of this Agreement in which GCP may terminate the GCP Agreement and all of GCP's obligations to Fighter and SDI with respect to Fioghter shall terminate immediately.

1.2    Fighter hereby grants MTP, and SPC  (collectively, "Promoter") the sole and exclusive right to secure and arrange all bouts (including, without limitation, boxing, mixed martial arts, martial arts, kickboxing, wrestling or any other combative sports bouts, contests, competitions or exhibitions, whether as an individual or team participant and whether as a professional or amateur participant) (individually, a "Bout" and collectively, the "Bouts") requiring Fighter's services and to secure, arrange and promote all such Bouts, all upon and subject to the terms and conditions hereinafter set forth.   Fighter agrees that his Bouts will be conducted and the officials shall be designated in conformity with the rules and regulations of the applicable athletic or boxing commission and/or the World Boxing Council ("WBC") and/or the World Boxing Association ("WBA") and/or the International Boxing Federation ("IBF") and/or the World Boxing Organization ("WBO") and/or any other sanctioning organization, and Fighter agrees that he will fully comply with all such applicable rules and regulations.  Fighter agrees that he shall participate in each of the Bouts to best of Fighter's ability and that he shall diligently prepare for and honestly compete in each of the Bouts.  Fighter further agrees that he shall stay in top physical condition and maintain his fighting weight during the term hereof so that Fighter will be ready, willing and able to participate in a Bout offered by SPC on the scheduled date.  Fighter agrees that he shall not take or use any drugs or other substances which are prohibited by U.S. Federal or State law or any of the State athletic or boxing commissions in the United States or any of the WBA, WBC, WBO and IBF and will otherwise comply with all of the anti-doping rules of such commissions and sanctioning organizations.  Except as otherwise provided by the rules and regulations of the applicable athletic or boxing commission with jurisdiction over an applicable Bout, Fighter agrees that SPC shall have the right to designate

3

any and all matters pertaining to the presentation and staging of the Bout.

1.3    Subject to the terms and conditions hereinafter set forth, Fighter hereby exclusively grants to Promoter the following rights, including, but not limited to, all worldwide rights, title and interest to the Bouts promoted by Promoter hereunder, in perpetuity, including, but not limited to:

(a)    The right to all site fees, live-gate receipts, sponsorship fees, and motion picture, radio, television (whether live or delayed, interactive, home or theater, pay, pay-per-view, satellite, closed circuit, cable or subscription), telephone, computer, CD-ROM, broadband, digital, and online services, the worldwide web and the "Internet" (as such term is commonly understood currently or in the future) (collectively, the "Internet"), video and audio cassette, virtual advertising, photograph, including raw footage, out takes and negatives, merchandising and program rights now or hereinafter invented in connection with or based upon the Bouts or the activities pertaining to the Bouts, including, but not limited to, training and press conferences for the Bouts (the "Pre-Bout Events"), post-fight press conferences (the "Post-Bout Events) and any parts thereof on a commercial, sustaining, theatrical or other basis, and by any and all means, methods and devices, whatsoever;

(b)    The right to sell, assign, lease, license, sublease, use or otherwise dispose of any and all of the rights granted hereunder and the results of the exercise thereof, and to authorize, license and grant the right to exercise any of the rights granted hereunder;

(c)    The right to do all things necessary for the full and complete use, exploitation and exercise of the rights granted Promoter hereunder, including the right to promote, exploit and turn to account all rights granted hereunder and the results of the exercise thereof, and the

4

right to negotiate, enter into and perform any and all agreements relating to said rights for the proper production and promotion of radio, television and Internet broadcasts of the Bouts, the Pre-Bout Events and the Post-Bout Events, such as announcers, commercials, artwork and other elements;

(d)    All right, title and interest in and to any recordings of the television, Internet and radio broadcasts and motion picture films and video and audio cassettes of, or based upon the Bouts, the Pre-Bout Events and the Post-Bout Events, including, but not limited to, magnetic tapes, and the right to secure in its own name or that of its nominee copyright and other protection to the extent available throughout the world;

(e)    The right to use in any media the name, likeness and biography of Fighter, his manager, trainers and other persons associated with him who are connected with the Bouts, for the purpose of advertising, promotion, publicity, merchandising and exploitation of the Bouts, the Pre-Bout Events and Post-Bout Events all without compensation or payment to any of the aforesaid parties, provided, however, that in no event may such names, likenesses or biographies be used as an endorsement of any commercial product or service; and

(f)    The non-exclusive right to use a three minute clip of the recording of any prior bout, press conferences, interviews, training sessions or other footage in which Fighter was a participant to the extent that Fighter possesses the rights thereto or can reasonably obtain such rights for the purposes of publicizing, advertising and promoting the Bouts and for inclusion within Promoter's and its licensees' telecasts of the Bouts which shall be delivered to Promoter upon request therefore.

1.4   As further consideration for these rights, SPC  shall pay MTP the sum of Twenty Thousand Dollars ($20,000.00) , upon the full execution of this Agreement.

## 2.    **Minimum Bouts, Purses and Accommodations.**

2.1 SPC is obligated and agrees to offer to MTP and Fighter during each year of the term, the right to participate in a minimum number of "Bouts", as set forth below (the "Minimum Bout Offer Requirement.") Such Bouts shall be on dates and at sites determined by SPC and MTP and shall be governed by the following minimum purse requirements (the "Minimum Purse Requirement").  For purposes of this Agreement, and in satisfaction of SPC's obligations under this Agreement, SPC shall be deemed to have complied with its obligations with respect to any Bout if it shall have made a bona fide offer to Fighter to participate in a Bout irrespective of whether such Bout actually takes place for any reason other than SPC's nonperformance.  If such Bout is postponed or canceled for any reason whatsoever, the failure of such Bout to take place shall not be deemed nonperformance by SPC.  In the event that during the term hereof Fighter is recognized as a world champion or a mandatory or elimination challenger by one or more sanctioning organizations and is designated by a sanctioning organization to participate in a mandatory or elimination bout, SPC's obligation to offer Bouts to Fighter pursuant to the first sentence of this Paragraph shall be suspended during the period commencing on the date of such designation and ending on the completion of such mandatory or elimination bout.

2.1.1 The first Bout (the "First Bout") under this Agreement shall be scheduled to occur within ninety (90) days of the execution of this Agreement.

2.1.2 Fighter's purse for the First Bout shall, unless otherwise agreed upon by the parties in writing, be a minimum of Twenty Five Thousand Dollars ($25,000.00) against 70% of the Net Revenues (as defined below) from the applicable boxing event (the "Event") featuring Fighter's Bout (it being understood and agreed that such amount shall be the "Fighter's Purse" for his First Bout).  For the avoidance of doubt, the parties agree that Seventy Percent (70%) of the Net Revenues from such Event will be allocated and distributed to Fighter and Thirty Percent (30%) of the Net Revenues from such Event will be allocated and distributed to SPC; provided, however, that SPC guarantees to

Fighter that Fighter's 70% share of Net Revenues shall not be less than $25,000.

2.1.3   Except as provided in Section 2.1.2 above for the First Bout, Fighter's purse for each of Fighter's Bouts covered by this this Agreement shall, unless otherwise agreed upon by the parties in writing, be  a percentage of the Net Revenues (as defined below) from the Event as follows: (i) Net Revenues shall first be allocated and distributed to pay Fighter the first One Hundred Thousand U.S. Dollars ($100,000.00) in Net Revenues, (ii) the next Fifty Thousand U.S. Dollars ($50,000.00) of Net Revenues shall be allocated and distributed to SPC and (iii) any and all remaining Net Revenues shall be allocated and distributed Seventy Percent (70%) to Fighter and Thirty Percent (30%) to SPC (it being understood and agreed that the amounts paid to Fighter under clauses (i) and (iii) above shall be the "Fighter's Purse" for the applicable Bout and SPC hereby guarantee to Fighter that such amounts shall not be less than One Hundred Thousand U.S. Dollars ($100,000.00)).

2.1.4   Fighter hereby irrevocably conveys, transfers and assigns payment of Fighter's Purse to MTP, it being understood that such payment will be made by SPC to MTP and Fighter, jointly, in Florida and constitutes the entirety of MTP's and Fighter's share of the co-promotion and is limited to the Fighter's Purse.  In the event that any amounts of Net Revenues are paid solely to Fighter as a result of Fighter's local bout agreement or for any other reason whatsoever, such amounts paid to Fighter shall be deducted from any amounts due MTP/Fighter under this Agreement.

2.1.5   The term "Gross Revenues" means all monies actually received by SPC or MTP or Fighter as consideration for exhibiting the applicable Event or licensing the right to exhibit or distribute the Event, including, but not limited to, revenue derived from ticket sales, site fee, provisions of services fee, sponsorships and merchandising sales, and licensing the right to exhibit and distribute the Event, including, but not limited to, domestic and foreign television, Internet and mobile sales, including, without limitation, net PPV  and/or CCTV revenues received by a party

and any delayed video license fees in the amount equal to the amounts actually received by parties from such delayed video distribution.   Gross Revenues shall be determined after all refunds, credits, discounts and agency commissions.  Advance payments and security deposits shall not be included in Gross Revenues until earned, forfeited or applied to the Event.  Gross Revenues shall include receipts from radio, mobile, cable, Internet or television broadcasters or from others who may exhibit or distribute the Event to the public, such as net PPV and/or CCTV revenues.  Non-monetary considerations received from the licensing of the Event shall, not be deemed part of the Gross Revenues until actually converted into United States currency and then only when, to the extent of, and in the amount actually received by any party.

2.1.6 The term "Net Revenues" means any and all Gross Revenues generated by the applicable Event (irrespective of when such revenues are actually received by a party) attributable to agreements entered during the period (the "Event Exploitation Period") prior to the applicable Event and ending on the date which is one year from the date of the applicable Event  over any and all expenses (the "Event Expenses") related to the Event, including, without limitation, main event purses (but not including Fighter's Purse), undercard fighter purses, medical fees and exams, publicity, advertising, commission costs, sanctioning costs, promotional tickets, arena rental, officials, transportation, lodging, per diem expenses, insurance, bank fees, credit card charge fees, consulting fees and any and all other expenses directly related to Event, but not including office overhead allocation; provided, further, however, that Net Revenues shall not include refunds, credits, discounts and agency commissions, advance payments and security deposits (until earned, forfeited or applied to the applicable Event) or non-monetary considerations received from the licensing of the applicable Event (unless and until actually converted into United States currency and then only when, to the extent of, and in the amount actually received by any party). Net Revenues and expenses hereunder shall be determined in accordance with generally accepted accounting principles, consistently applied and determined on an event-by-event basis.  MTP and SPC shall

approve all expenses for an Event, such approval to be made in good faith and not unreasonably withheld or delayed and MTP and SPC agree that they will not object to normal and customary expenses incurred by promoters for a boxing event of the caliber of the Event in which Fighter is featured; provided, however, that with respect to all negotiations with the site and domestic television network for an Event, MTP shall have the right to participate in all such negotiations and review all agreements (including site deals) and any offers made for each Event. The parties understand and agree that the worldwide copyright to each Event shall be jointly owned by MTP and SPC , and each of such parties be entitled to exploit such copyright and retain all revenues from its exploitation of such copyright attributable to agreements entered into after the Event Exploitation Period without having to account to the other parties.

2.1.7   The parties agree that the co-promotion shall take such action with respect to any decision regarding an Event that will maximize Net Revenues to the co-promotion. If, however, the parties are unable to agree in good faith on any item with regards to an Event, including, but not limited to, the venue deal, television deal, sponsorship deal, undercard expenses, opponent expenses, travel and hotel expenses, marketing expenses, and/or any other Event revenue or expense item or reach an impasse as to whether said agreement or expense is reasonable and in the best interests of the co-promotion, Marc Ratner ("Ratner") will be contacted to act as final adjudicator to decide, as Ratner shall so determine in his sole and absolute discretion, whether said agreement or Event expense will maximize Net Revenues to the co-promotion and Ratner's decision will be final and conclusive and not subject to appeal or challenge by any party hereto.

2.1.8   During the Initial Term, SPC shall offer to Fighter the opportunity to participate in a minimum of three (3) Bouts per year. If during the initial term of this Agreement or any extension hereto, Fighter is recognized as a world champion by the WBC, IBF, WBA and/or WBO, then with respect to the contractual year in which Fighter is so recognized, the minimum requirement of three (3) Bouts per year shall be modified to two (2) Bouts per year.

9

2.1.9 Notwithstanding any other provision of this Agreement to the contrary, in the event that Fighter does not win the first Bout or any subsequent Bout or ceases for any reason to be a world champion, (i) Fighter's purse for Bouts subsequent to any such event which are marketed as the main event of an Event shall be negotiated and mutually agreed upon between the parties but shall not be less than, unless otherwise agreed upon by the parties herein, the greater of (X) Twenty Five Thousand U.S. Dollars ($25,000) or (Y) seventy percent (70%) of the Net Revenues from such Event or (ii) Fighter's purse for Bouts subsequent to any such event which are not marketed as the main event of an Event shall be negotiated and mutually agreed upon between the parties but shall not be less than, unless otherwise agreed upon by the parties herein, the greater of (X) Twenty Five Thousand U.S. Dollars ($25,000) or (Y) seventy percent (70%) of the Net Revenues directly attributable to Fighter's Bout (the "Direct Net Revenues").    The parties understand and agree that Direct Net Revenues shall only include as Gross Revenues those revenues which are directly attributable to Fighter's Bout, including, without limitation, any license fee paid by the US domestic television network for such Bout (but excluding ticket sales and any other amounts that cannot readily be determined to be directly attributable to Fighter's Bout) less such Event Expenses that are directly attributable to Fighter's Bout.  For example, if Fighter loses his first Bout and for his next Bout, he participates in a co-feature bout but not the main event on an Event broadcast by Showtime and Showtime licenses the rights to such Bout for a license fee of $75,000 and Fighter's opponent and other costs (e.g., rooms, travel, etc.) directly attributable to such Bout are $15,000, Fighter's purse would be $42,000, i.e., 70% x ($75,000 - $15,000). If Fighter wins a World Title and then losses a subsequent Bout, Fighter's minimum purse for his next Bout following said loss will be Sixty Five Thousand Dollars ($65,000.00); provided, however, that such minimum and Fighter's Purse for such next Bout shall be determined against

the Net Revenue share as described herein, whichever is greater.

2.1.10 All revenue and expense information will be provided to MTP and Fighter within ninety (90) days of the Bout.  For each Bout, SPC will provide to MTP written disclosure of all information required to be disclosed pursuant to applicable state and federal laws and regulations prior to and after said Bout.

2.2.    Notwithstanding any other provision of this Agreement to the contrary, the parties recognize that, during the term of this Agreement, Fighter may be eligible to participate in a bout (a "Purse Bid Bout") that will be the subject of a purse bid or purse offer conducted by a sanctioning organization and acknowledge that such bouts are generally reserved for championship or elimination bouts.  Fighter acknowledges that SPC's promotional efforts on Fighter's behalf are a significant contributing factor in Fighter becoming eligible to participate in such a Purse Bid Bout.  In the event that Fighter is designated as a participant in a Purse Bid Bout and SPC does not win the rights to promote such Purse Bid Bout, then, in consideration of SPC's overall promotional obligations hereunder and with the understanding that SPC will lose the opportunity to profit from said bout notwithstanding those efforts, Fighter shall pay to SPC a fee in recognition of SPC's overall promotional services and the benefits realized by Fighter thereby.  The fee to be paid by Fighter to SPC in such case shall bear a relationship to the benefits realized by Fighter and shall, accordingly, be an amount equal to Thirty Percent (30%) (Twenty Percent (20%) in the event that such Purse Bid Bout is a mandatory defense of the WBA, WBC, IBF and/or WBO World Title then held by Fighter defense) of any amount paid to Fighter in respect of such Purse Bid Bout, unless otherwise agreed upon by the parties herein.  The fee referred to in the immediately preceding sentence shall be paid by Fighter to SPC by check upon completion of the Purse Bid Bout; provided, however, that if requested by SPC, Fighter shall and hereby does irrevocably direct the promoter of such Purse Bid Bout to pay such amount directly to SPC by check upon completion of the Purse Bid Bout.  The parties further understand and agree that (i) SPC shall have no obligation to make any bid with respect to any Purse Bid Bout, (ii) in the event that SPC makes a bid, the amount of such bid shall be in SPC's sole and exclusive discretion and shall not in any way be tied to SPC's minimum

purse obligations under this Agreement, (iii) SPC shall have no obligation to make a bid that would, if the bid were the winning bid, result in Fighter receiving any specified amount in respect of such Purse Bid Bout (including any minimum purse otherwise provided for by this Agreement), (iv) in the event SPC wins the rights to promote the Purse Bid Bout, Fighter's purse and other compensation and benefits (including, without limitation, training expenses, travel and hotel accommodations and meals) for the Purse Bid Bout shall be in accordance with the rules and regulations (or applicable ruling or order) of the applicable sanctioning organization conducting the purse bid or purse offer (as opposed to any differing rights provided by this Agreement), and (v) such Purse Bid Bout shall, whether or not SPC promotes such Purse Bid Bout, be deemed to constitute a Bout hereunder for purposes of calculating the number of Bouts SPC is required to offer Fighter during each year of the term hereof. Notwithstanding the above, if SPC wins the right to promote such Purse Bid Bout, SPC agrees that Fighter's minimum purses shall be his share of the Net Revenues received for said Bout, or One Hundred Thousand Dollars ($100,000.00), whichever is greater.

2.3   Travel, Accommodations, Tickets. In addition to the Fighter's minimum purses as set forth above, the parties agree that Fighter shall be provided with a minimum of four (4) round trip economy class airline tickets and One (1) business class ticket for each non-title Bout that does not occur within One Hundred and Fifty (150) miles of New York City, or the city where Fighter is training for said Bout.  SPC shall also provide accommodations and meal allowances for a minimum of five (5) persons for each non-title Bout Fighter participates in, as well as a minimum of Twelve (12) complimentary ringside tickets to each such Event.  When Fighter defends the World Title, the parties agree that Fighter shall be provided with a minimum of six (6) round trip economy class airline tickets and one (1) business class ticket for each World Title defense.  SPC shall also provide accommodations and meal allowances for a minimum of seven (7) persons, as well as a minimum of twelve (12) complimentary ringside tickets to each such Event.  The parties understand and agree that the actual costs and expenses incurred by SPC to provide the foregoing to Fighter shall constitute an Event Expense and shall be deducted in determining Net Revenues for the applicable Event for which the foregoing costs and expenses are incurred.

2.4    For all Bouts broadcast in the United States by Showtime, HBO, Premium Cable or Pay-Per-View, Fighter's minimum purse for said Bout shall be directly paid to MTP directly by the applicable U.S. broadcaster, and the parties shall execute any necessary documents or provide any necessary directions to the broadcaster for this to occur, subject to applicable commission approval.

### 3.    <u>Term:  Extension and Termination.</u>

3.1    (a)    This Agreement shall be for an initial term (the "Initial Term") of two (2) years, commencing on the date hereof, excluding any time that Fighter is unavailable or unable to compete due to injury or any other cause.

(b) In the event that Fighter is recognized by the WBC, WBA, IBF and/or WBO as a world champion (a "World Title") during the Initial Term hereof, the Initial Term of this Agreement shall be extended for a period sufficient for Promoter to promote Fighter's first four (4) world title defenses (each a, "World Title Defense Bout"), without any interveneing bouts, from the date Fighter is first recognized as world champion.  If Fighter is recognized as a world champion during the term hereof, including any 18-month extension period referred to below, but ceases to be recognized as a world champion prior to his participating in a total of four (4) World Title Defense Bouts, this Agreement will be extended for an eighteen (18) month period, from the first time Fighter ceases to be recognized as a world champion, it being understood however that upon completion of a total of four (4) World Title Defense Bouts by Fighter hereunder (irrespective of when such title defenses occur) or the expiration of the 18-month period referred to above (and Fighter not having regained a World Title within such 18-month period), this Agreement shall terminate. If Fighter is recognized as a world champion during the term hereof, including the 18-month extension period referred to above, but loses another World Title Defense Bout and thus again ceases to be recognized as a world champion prior to his participating in a total of four (4) World Title Defense Bouts, this

13

Agreement will be extended for an additional twelve (12) month period from the time(s) Fighter loses his second or subsequent World Title Defense Bouts, it being understood however that upon completion of a total of four (4) World Title Defense Bouts by Fighter hereunder (irrespective of when such title defenses occur) or the expiration of a 12-month period referred to above (and Fighter not having regained a World Title within such 12-month period), this Agreement shall terminate.  If Fighter is not recognzied by the WBC, WBA, IBF and/or WBO as a world champion within the Initial 2 year Term, this Agreement shall terminate upon the expiration of the Initial Term.  For example, if Fighter is recognized by the WBC as world heavyweight champion and then loses his first World Title Defense Bout, the term of this Agreement shall be extended for an 18-month period from the date of such loss.  If during such 18-month extension, Fighter is recognized by the WBO as world heavyweight champion, the term of this Agreement shall be extended until SPC has promoted Fighter in a total of 4 World Title Defense Bouts.  If Fighter loses such WBO title prior to SPC promoting Fighter in 4 World Title Defense Bouts, then the term of this Agreement shall be extended for an additional 12 month period. If Fighter then is recognized by the WBA as world heavyweight champion during such 12-month period, but then loses such title prior to SPC promoting Fighter in 4 World Title Defense Bouts, then the term of this Agreement shall be extended for an additional 12 month period and so on, until SPC has promoted Fighter in 4 World Title Defense Bouts or an applicable 12-month period expires without Fighter regaining a World Title.

3.1.1 In the event that Fighter for any reason whatsoever (other than SPC's non-performance of its obligations under this Agreement or the injury or physical disability of an opponent) fails to win a Bout or to engage in the minimum number of Bouts per year, provided such bouts are offered to Fighter by SPC as outlined in paragraph 2.1.3, SPC shall have the right but not the obligation to terminate this Agreement within sixty (60) days of such event by written notice to Fighter.

3.1.2 Fighter acknowledges that any agreement between Fighter and any U.S. media outlet, including, but not limited to, broadcasters such as HBO, Showtime or Other U.S. Premium Cable Network, ("Media Outlet Agreement") shall constitute valuable consideration to Fighter.  Accordingly, Fighter agrees that if (1) Fighter becomes a party to any Media Outlet Agreement; or (2) any Media Outlet Agreement to which Fighter is a party is extended beyond the term of this Agreement, then, based on such consideration, the term of this Agreement shall be extended so that it expires no earlier than the term of any such Media Outlet Agreement. In this eventuality, Fighter shall also have the right, prior to entering into such Media Outlet Agreement, to re-negotiate the terms of this Agreement with SPC

### 4.    Bout Agreement.

For each Bout hereunder, Fighter, SPC and MTP shall each (a) execute any and all contracts required by the athletic or boxing commission with jurisdiction over such Bout, and (b) negotiate in timely fashion and in good faith regarding any matters relating to such Bout which are not covered by such required form contracts or by this Agreement.

### 5.    Postponement.

If any Bout scheduled to be promoted hereunder is postponed for any reason, the Bout Agreement applicable to such bout shall determine the rights of the parties.

### 6.    Disability/Retirement.

In the event Fighter becomes permanently or partially disabled or is otherwise unable or unavailable to participate in Bouts for any reason whatsoever (including, without limitation, Fighter having his fighter's license suspended or revoked, being incarcerated or legally restrained from fighting, refusing to fight, contractual disputes or challenges (including, without limitation, administrative or judicial proceedings regarding the enforceability of this Agreement) or any other reason) during the term of this Agreement, SPC shall have the right to either suspend the term

hereof during the period of such disability, inability or unavailability to participate in Bouts or to terminate this Agreement upon notice to Fighter without any liability or obligation to Fighter, it being understood that SPC shall be deemed to have elected to suspend this Agreement unless SPC notifies Fighter of its election to terminate this Agreement.  At SPC's sole election, this Agreement may be suspended during the period of Fighter's temporary retirement, if any, but shall become fully operative if and when Fighter resumes his fighting career.

7.  **Further Assurances**.

The parties shall execute any and all additional documents or instruments necessary or desirable to effectuate the provisions of this Agreement, including, without limitation, a standard boxing contract in such form as may be required by SPC, the local governmental authority with jurisdiction over the bout and/or the world organization(s) sanctioning the bout if applicable.  No party hereto shall take any action or fail to take any action which action or failure shall frustrate the purposes of this Agreement and the benefits contemplated hereby.

8.  **Promotion**.

Fighter agrees that without additional consideration or compensation he will cooperate and assist in the advertising, publicity, and promotion of the Bouts and his fighting career, including his appearance at such press conferences, interviews and other promotional activities as SPC/MTP may designate; provided the same does not unreasonably interfere with Fighter's training schedule.

9.  **Assignment**.

SPC shall have the absolute right to assign, license, or transfer any or all of the rights granted to it hereunder, including, without limitation, the right to co-promote the Bouts in association with or to deliver the services of fighter to any one or more persons or entities of SPC's choosing. Neither Fighter nor SPC may assign any of his or its respective obligations hereunder without the

other's consent. Fighter represents and warrants that he is the sole and exclusive owner of MTP and may assign any rights granted to it to any person or entity, as long as said person or entity does not interfere with SPC's rights under this Agreement and MTP complies with all of its obligations under this Agreement.

10. **Exclusivity**.

In consideration of the obligations of SPC to secure, arrange for, and promote Bouts requiring Fighter's services, and to pay Fighter's Purses, and divide Net Revenues as defined herein as provided herein, Fighter agrees that during the term hereof, Fighter shall not participate in any bouts other than Bouts promoted or co-promoted by SPC or for which SPC has granted Fighter prior written permission and Fighter shall not render his services as a combative sports participant to any person, firm or entity other than SPC, except with SPC'ss prior written permission.  Fighter recognizes and agrees that this restriction is necessary to protect SPC'ss legitimate business interests, including SPC's ability to promote first class combative sports events for Fighter and other fighters whom SPC promotes, against world class opponents, at top venues, broadcast by top American and foreign broadcasters.  Fighter acknowledges that SPC has substantial relationships with a number of venues, broadcasters, and other world class boxers, and that these relationships are protected by the SPC's ability to guarantee the availability of Fighter through this Agreement.

11. **Independent Contractor**.

Nothing herein contained shall be construed to constitute Fighter as an employee of SPC or SPC a fiduciary of Fighter. Fighter and SPC are independent contractors vis-à-vis each other and this Agreement shall not be construed to be a partnership, joint venture, trust or any other type of similar arrangement.  As an independent contractor, Fighter shall be solely responsible for his own actions and expenses and except as otherwise expressly set forth herein, Fighter shall be solely

responsible for the payment of any and all costs and expenses incurred by him in connection with the Bouts, including, without limitation, payment of all fees to his manager, trainers, seconds, assistants, sparring partners, his entourage, maintenance and training expenses, fighter's sanctioning fees, , taxes, fighting licenses, and travel, food and accommodations in excess of the amounts provided by SPC and MTP as set forth herein. Medical testing, anti doping fees, Promoter's sanctioning fees, other Event licenses, costs of Championship belts, Event rights clearances, Event insurance (but not Fighter's personal medical insurance), visas, permits and other government authorized expenses shall be deducted from Gross Revenues from the applicable Event as set forth herein. Fighter shall, at his own cost and expense, be solely responsible for obtaining all boxing licenses for himself and his cornermen.

12. **Equitable Relief**.

Fighter acknowledges that his services as a professional boxer are special, unique, extraordinary, irreplaceable and of peculiar value, and that in the event of Fighter's breach or threatened breach of this Agreement, SPC would suffer irreparable damage, which could not be reasonably or adequately compensated by an action at law. Accordingly, Fighter expressly agrees that in the event of such breach or threatened breach, SPC shall be entitled, in addition to all other rights and remedies available to it, to obtain equitable relief (without having to secure any bond or other security in connection with SPC's application for such relief), including, but not limited to, an injunction against such breach in any court of competent jurisdiction, and that Fighter will not assert as a defense in any such action that SPC has an adequate remedy at law.

13. **Attire/Clearances**.

Fighter agrees that no advertising or promotional material (including, but not limited to, permanent or temporary tattoos or body art) shall appear on the body of or on any item of clothing worn by Fighter, his trainers, seconds, assistants or other

members of his team or entourage during and/or at the Bouts, press conferences, training sessions open to the public or press, or while at the site of the Bouts that conflict with any Event sponsor or licensee.    During the term of this Agreement, Fighter agrees that he will not  (and will cause his manager, trainers, seconds, assistants and other members of his team not to) attend or participate in any shows, interviews, programs, special events or other activities produced, published, broadcast, sponsored or hosted by or held in or otherwise affiliated with any newspaper, magazine, book, Internet or other publisher, or any Internet, radio or television broadcaster, or any casino (including, without limitation, on-line casinos), hotel or arena or any other sponsor or licensee of combative sporting events which conflict with a sponsor or licensee of the applicable Event or that has the potential to be harmful to or negatively interfere with the applicable Event.  If there is any questions about this issue, the parties shall confer in good faith and if necessary, seek the assistance of Ratner to resolve any impasse.

14.    **Representation, Warranties and Covenants**.

A)    Fighter and MTP represent, warrant and covenant to SPC that they are free to enter into this Agreement and have not heretofore and will not hereafter enter into any contract, agreement or understanding, whether oral or written, which conflicts in any material respect with the provisions hereof or which purports to grant similar or conflicting rights to any person, firm, or entity other than SPC, or which would or might interfere with Fighter's and MTP's full and complete performance hereunder or the free and unimpaired exercise by SPC of any of the rights granted to SPC under this Agreement. Fighter and MTP further represent and warrant to SPC that there are no claims pending or threatened or any litigation affecting Fighter, which would or might interfere with the full and complete exercise or enjoyment by SPC of any rights granted hereunder.

B)    Fighter and MTP further acknowledge that SPC are entering into this Agreement in reliance upon warranties,

19

representation and covenants herein, and Fighter and MTP agree to indemnify, defend and hold SPC and their affiliates harmless from and against any and all liability, cost or expense, including reasonable attorney's fees, SPC or their affiliates may sustain or incur as a result of the breach of inaccuracy of any said warranties, representation and covenants.

C)     SPC shall indemnify and hold harmless Fighter and MTP and entity affiliated with Fighter against any and all claims, liabilities, or other damages arising from, related to, or caused in any way by any claimed breach by SPC of other agreements.

D)     Fighter understands and agrees that by training for and participating in combative sports, Fighter is engaging in an abnormally dangerous activity and that Fighter's participation in this activity subjects Fighter to a risk of severe injury or death and that the effects of such participation may include severe medical problems which develop many months or years later.  Fighter, with full knowledge of this risk, nonetheless agrees to enter into this Agreement and to participate in the Bouts and hereby, on behalf of himself and as applicable, his spouse, heirs, executors, administrators, successors and assigns, waive, release and forever discharge any and all claims that Fighter and/or his spouse, heirs, executors, administrators, successors and assigns may have against any of the Promoter or their affiliates arising from or related to any injury or death Fighter may suffer as a result of his training for or participation in combative sports.

## 15.  <u>Other Activities of SPC/MTP</u>.

Nothing herein shall prevent SPC,  or MTP from engaging in promotion activities for any other professional boxer, including others in the same weight class as Fighter, or any other activities.

16.  **Right of First Negotiation/Last Refusal.**

(a)    Upon the expiration of the term of this Agreement or in the event that SPC exercises its right to terminate this Agreement as provided herein, Fighter grants to SPC, an optional right of exclusive "first negotiation" (as set forth herein).   SPC shall be deemed to have exercised, and hereby elects to exercise its right of first negotiation, unless SPC notifies Fighter of its election to waive such right upon the expiration of the term hereof or SPC's termination of this Agreement. For purposes of this Agreement, SPC's right of first negotiation shall mean that for thirty (30) days after the date of expiration of the term of this Agreement or upon SPC's termination hereof (the "Exclusive Negotiation Period"), Fighter shall negotiate exclusively and in good faith with SPC with respect to Fighter's promotional rights and entering into a new exclusive promotional agreement with SPC.

(b)    In the event no agreement between SPC and Fighter is reached with respect to a new exclusive promotional agreement by the end of the Exclusive Negotiation Period, Fighter may negotiate with any third party with respect to Fighter's promotional rights; provided, however, that during the period (the "Last Refusal Period") commencing on the expiration of the Exclusive Negotiation Period and ending six (6) months thereafter, Fighter may not enter into any agreement with a third party or parties with respect to Fighter's promotional rights, including, without limitation, promotional agreements, bout agreements or option agreements, without first making to SPC a written offer (containing full details in regard thereto as well as a copy of the actual offer received by Fighter from such third party), which offer shall be irrevocable for at least ten (10) business days after SPC's receipt thereof, to enter into an agreement with SPC therefor on the same Financial Terms (as defined below) offered by or to Fighter to or by said third party or parties.   If SPC rejects, or fails to accept, such offer within such 10 business day period, then and only then, shall Fighter be free to enter into such agreement with such third party or parties.   If Fighter does not enter into such agreement with said third party or parties within 5 days of the expiration of such 10 business day period, the terms of this Paragraph shall apply to any outstanding, renewed or subsequent offer received or made by Fighter with respect

21

to Fighter's promotional rights. SPC's failure to accept any such offer from Fighter shall not constitute a waiver of SPC's rights of last refusal with respect to any outstanding, renewed or subsequent offers. The parties understand and agree that the term "Financial Terms" only requires SPC to match the economic terms being offered by or to Fighter to or by said third party or parties for Fighter's purses for his bouts and does not require SPC to match any non-economic terms, including, without limitation, title opportunities, fighting on particular dates, fighting more than two times per year, fighting particular opponents, fighting on particular networks, or at particular venues.

## 17.  <u>Non-Disparagement Clause.</u>

Each of the parties agrees that he or it will not criticize, ridicule, or make any statement that disparages or is derogatory of any other party, or any of its members, investors, officers, directors, agents or employees, whether or not such disparaging or derrogatory statements are true or not, except in connection with a legal proceeding, court order or as otherwise required by law.

## 18.  <u>Forum Selection/Governing Law/Mediation.</u>

(a)  Each of the parties irrevocably submits to the exclusive jurisdiction of any Federal or State Court of competent jurisdiction sitting in the County of New York, New York (the "New York Forum") for any disputes arising out of or related to this Agreement or Fighter's Bouts hereunder and agrees that the New York Forum shall be the exclusive venue for any and all disputes arising out of or related to this Agreement or Fighter's Bouts hereunder. Except as provided in the last sentence of this Subparagraph (a), the parties agree that any action or proceeding brought by a party arising out of or in any way related to this Agreement or the Bouts shall be brought only in the New York Forum. Each of the parties hereby waives any objection to venue in the New York Forum and any objection to any action or proceeding in the New York Forum on the basis of *forum non conveniens.* Nothing in this Subparagraph (a) shall affect the right of a party to serve legal process or bring any action or proceeding hereunder in any manner permitted by law. Each of the parties agrees that a final judgment in any action or

22

proceeding brought by a party shall be conclusive and may be enforced by such party in other jurisdictions by suit on the judgment or in any manner provided by law.  As an alternative method of personal service, each of the parties irrevocably consents to the service of any and all process in any action or proceeding brought by a party by the sending of copies in the manner provided for the sending of notices in this Agreement. When and if a site for a Bout pursuant to this Agreement is selected within the State of New York or Florida, the parties further mutually agree to, and shall execute all documents required by the Rules and Regulations of the applicable commission with jurisdiction over the Bout in a timely fashion, and mutually agree to, and shall, fully comply with all other requirements of the applicable commission and its applicable rules and regulations.  The parties further agree that, except by appropriate application to the applicable New York or Florida State Athletic Commission pursuant to its applicable rules and regulations, neither party shall assert any claim that non-compliance with the Rules and Regulations of the New York or Florida State Athletic Commission shall render this contract void or unenforceable.

(b)  This Agreement shall be governed, construed and enforced in accordance with the substantive law of contracts of the State of Florida and without regard to Florida choice of law principles or conflicts of law principles.  In no event shall a party be entitled to punitive damages in any action arising under or in any way related to this Agreement, and all parties hereby waive their rights to any punitive damages.

**19.  <u>Severability</u>**.

Nothing contained in this Agreement shall require or be construed as to require the commission of any act contrary to any law, rule or regulation of any governmental authority, and if there shall exist any conflict between any provision of this agreement and any such law, rule or regulation, the latter shall prevail and the pertinent provision or provision of this agreement shall be curtailed, limited or eliminated to the extent necessary to

remove such conflict, and as so modified, this Agreement shall continue in full force and effect.

**20. <u>Waiver</u>**.

No waiver by any party of any breach or default hereunder shall be deemed to be waiver of any preceding or subsequent breach or default. All waivers must be in writing, specify the breach or default concerned and be signed by the party against whom the waiver is sought to be enforced. The payment of any monies by any party shall not be deemed a waiver. This Agreement and the rights and obligation of the parties hereunder shall inure to the benefit of and be binding upon the permitted assigns, successors and affiliated entities to the parties hereto.

**21. <u>Confidentiality</u>**.

A party shall not disclose to any third party (other than his or tis employees and agents (including consultants), in their capacity as such, on a need-to-know basis), any information with respect to the terms and provisions of this Agreement except: (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event(s) that party shall so notify the other parties as promptly as practicable (if possible, prior to making such disclosure) and shall seek confidential treatment of such information, (ii) as part of normal reporting or review procedure to his or its banks, auditors and attorneys and similar professionals, provided that such banks, auditors and attorneys and similar professionals agree to be bound by the provisions of this paragraph, (iii) as may be required by law or the rules and regulations of any governmental entities (including, without limitation, state athletic or boxing commissions, anti-doping organizations, (including, without limitation, WADA, its NADOs, or VADA), administrative bodies, or sanctioning organizations (including, without limitation, the WBA, WBC, IBF and/or WBO and regional federations, such as, NABO, NABF, etc.) and (iv) in order to enforce his or its rights pursuant to this Agreement.

22. **Benefit**.

The provisions of this Agreement are for the exclusive benefit of the parties who are signatories hereto and their permitted successors and assigns, and no third party shall be a beneficiary of, or have any rights by virtue of, this Agreement (whether or not such third party is referred to herein).

23. **Entire Agreement**.

This Agreement sets forth and integrates the entire understanding between the parties, and supersedes any and all prior or contemporaneous written or oral agreements or representations between the parties with respect to the subject matter hereof. It may not be altered, amended or discharged, except by a subsequent writing signed by the parties hereto. Descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not be considered for purposes of its interpretation. Any ambiguities shall be resolved without reference to which party may have drafted this Agreement.

24. **Counterparts/Facsimile**.

This Agreement may be executed in counterparts, each of which shall be deemed and original and all of which shall together constitute one and the same instrument. Facsimile signatures shall be as effective as originals.

25. **Opportunity to Cure**.

In the event that a party (the "Claiming Party") claims that another party (or parties) has breached any provision of this Agreement, the Claiming Party shall give the other parties written notice detailing such claimed breach  The party (the "Alleged Breaching Party") that the Claiming Party claims has breached this Agreement, shall notify the Claiming Party within 30 days of his or its receipt of notice from the Claiming Party whether he or it intends to cure any such alleged breach.  In the event that the Alleged Breaching Party so notifies the Claiming Party that the

Alleged Breaching Party intends to cure said alleged breach, the Claiming Party shall be precluded from commencing any action against the Alleged Breaching Party based upon such breach provided the Alleged Breaching Party cures such breach within thirty (30) days from the Alleged Breaching Party's receipt of notice from the Claiming Party.  The Claiming Party consents in advance to the dismissal of any action commenced prior to the expiration of such thirty (30) day period.  Notwithstanding the foregoing, it is understood and agreed that SPC can pay the Fighter the minimum purse due for a Bout in lieu of a fight to cover any default and keep this Agreement in effect.

26.   **Notices**.

Any notice required or desired to be given hereunder shall be in writing and sent (i) postage prepaid by certified mail, return receipt requested, (ii) by e-mail or (iii) by confirmed facsimile, addressed as follows:

(a)   To:
Salita Promotions Corp.
5458 Claridge Lane
West Bloomfield, MI 48322
Telephone: 646-481-5558
Facsimile: 646-401-5658
Email: ds@salitapromotions.com

**With Copy to:**
John Wirt, Esquire
Wirt & Wirt, P.A.
3135 Bobby Jones Drive
Pace, FL 32571
Telephone: 847-323-4082
Facsimile: 314-431-6920
Email: mail@wirtlawfirm.com

(b)    To:
Jarrell Miller
115-11 Sutter Avenue South
Ozone Park,
Queens, NY 11425
Email: kingmillerboxing@gmail.com
Telephone: 347-725-2276

(c)    To:
Miller Time Promotions, LLC.
d/b/a Big Baby Miller
600 South Dixie Highway, #151
West Palm Beach, Florida 33401
Email: kingmillerboxing@gmail.com

**With Copy to:**
Leon R. Margules, Esquire
Law Offices of Leon R. Margules, PA
5397 Orange Drive, Suite 202
Davie, Florida 33314
Telephone: 954-587-0482
Facsimile: 954-583-7447
Email: marguleslaw@yahoo.com

All such notices shall be deemed given when mailed, e-mailed or sent by confirmed facsimile.

**IN WITNESS WHEREOF,** the parties have executed this agreement as of the date first above written.

SALITA PROMOTIONS CORP.

By:_____          _____
        Dmitry Salita, President                Jarrell Miller, Fighter

MILLER TIME PROMOTIONS, LLC
d/b/a BIG BABY MILLER

By:_____
        Jarrell Miller, President

All such notices shall be deemed given when mailed, e-mailed or sent by confirmed facsimile.

**IN WITNESS WHEREOF,** the parties have executed this agreement as of the date first above written.

SALITA PROMOTIONS CORP.

By:_____
    Dmitry Salita, President

*Jarrell Miller* 6/2/17
Jarrell Miller, Fighter

MILLER TIME PROMOTIONS, LLC
d/b/a BIG BABY MILLER

By: *Jarrell Miller* 6/2/17
    Jarrell Miller, President

## **AFFIDAVIT**

State of Florida ) 
                    )   ss:
County of Broward )

THE UNDERSIGNED, being first duly sworn, deposes and says:

1.     I have personal knowledge of the facts recited herein and could testify to them if called upon to do so.

2.     I am a professional boxer and voluntarily executed the foregoing Co-Promotional Rights Agreement (the "Promotional Agreement") with Salita Promotions Corp. ("SPC").

3.     The rights which I granted SPC pursuant to the Promotional Agreement were not granted as a condition precedent to my participation in a professional boxing match against another boxer.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information and belief.

_Jarrell Miller_ 6/2/17
Jarrell Miller

Subscribed and sworn before me
this _____ day of _____, 20___.

_____
NOTARY PUBLIC in and for said
County and State

My commission expires: _____
Commission No.: _____

29