# EXHIBIT 2

PRIVATE & CONFIDENTIAL

## PROVISION OF SERVICES AGREEMENT

This Provision of Services Agreement ("Agreement") is entered into on this __ day of February 2019 by and between **MATCHROOM BOXING LIMITED ("MBL")** and **SALITA PROMOTIONS CORP. ("SPC"), GREG COHEN PROMOTIONS, LLC ("GCP")** and **MILLER TIME PROMOTIONS, LLC ("MTP")**, for furnishing the services of **JARRELL MILLER ("JM")**.

## RECITALS:

A.      MBL will be promoting a boxing event to be held on June 1, 2019 (or on such rescheduled date if required in accordance with clause 10 below) featuring the Bout as the main event, with portions of the event to be broadcast globally (the "Event").

B.      SPC and MTP jointly hold the right to provide the professional boxing services of JM for this Event.  SPC, GCP and MTP shall be referred to herein collectively as the "Promoter."  Both SPC and MTP will be jointly and severally liable for any Promoter obligations under this Agreement.

C.      MBL has secured the right to provide the professional boxing services of ANTHONY JOSHUA ("AJ") for the Event.

D.      AJ is the current WBA (Super), IBF, WBO and IBO Heavyweight Champion of the World.

E.      The parties desire to enter into an agreement pursuant to which AJ and JM will engage in a twelve (12) round professional boxing match for the WBA Super, IBF, WBO and IBO (together, the "World Sanctioning Bodies") Heavyweight World Championships subject to sanction (the "Bout") as a part of the Event.

**NOW, THEREFORE**, the parties agree as follows:

1.      **THE BOUT**

(a) MBL agrees to cause AJ to engage in the Bout with JM, and Promoter agrees to cause JM to engage in the Bout with AJ, for twelve (12) rounds for the WBA Super, IBF, WBO and IBO Heavyweight World Championships (subject to receiving sanction) to a decision, to be promoted by MBL.  MBL shall be responsible for securing sanctioning of the Bout by the World Sanctioning Bodies, and Promoter shall use all reasonable endeavours to assist MBL including by submitting any necessary documentation.  Subject to the terms and conditions hereinafter set forth, including, without limitation, the right to postpone the Bout as provided in Section 10 below, MBL shall promote the Bout and the Event on June 1, 2019 at Madison Square Garden Arena, New York City, NY or such other venue in New York City as determined by MBL (the "Venue").

(b) The Bout will be conducted in conformity with the Unified rules of the Association of Boxing Commissions ("ABC Rules") at Appendix #1 supplemented by the rules of the World Sanctioning Bodies and the New York State Athletic Commission ("NYSAC") as necessary.

(c) It is agreed that the officials for the Bout shall be designated by the NYSAC in consultation with the World Sanctioning Bodies, in accordance with the NYSAC Rules

PRIVATE & CONFIDENTIAL

(Section 211.28). That notwithstanding, the Parties agree that MBL shall promptly request that the NYSAC agree that the officials for the Bout (referee and three judges) shall be from a neutral country (not the United Kingdom or the United States). Should the NYSAC not agree to such request for neutral officials, upon MBL learning of NYSAC's denial of its request, Matchroom shall request the officials for Bout shall be selected as follows – a referee from the United States (but not from New York state), a judge from the United States (but not from New York state), a judge from the United Kingdom (but not from Hertfordshire or Greater London) and a judge from a neutral country. Should the NYSAC not approve either of the above selection processes for officials then MBL shall have the right to terminate this Agreement; provided, however, that MBL shall not have the right to terminate this Agreement after April 1, 2019.

(d) AJ and JM shall wear 10oz gloves of their own choice subject to approval by the NYSAC. It is agreed that the fighters can wear different gloves if they so desire. Both AJ and JM will supply four (4) factory sealed pairs of their proposed gloves at the rules meeting. Selected gloves will be held following the rules meeting by the NYSAC and delivered to the locker room on the night of the Bout. A member of each team will be present in the opposing fighter's locker room to observe hand wrapping as well as putting the gloves on. AJ will enter the ring second and be announced second, shall be in the Blue home corner and shall have the first choice of locker room at the Venue as well as receive any other championship prerequisites. JM shall have second choice of all available dressing rooms at the Venue; provided, however, that such dressing room shall be for the exclusive use of JM and MBL shall ensure that the same includes a bed, bottled water, ice, towels and buckets. The ring shall have standard NYSAC approved padding and ring mat, and shall measure either 20 foot by 20 foot inside the ropes or 22 foot by 22 foot inside the ropes. MBL shall in its sole discretion confirm the final size of the ring by no later than 5pm ET on February 22, 2019. The first bell of the Bout will be between 21.30 and 23:00 NY Time, at a precise time to be decided in MBL's sole discretion. Both boxers are approved to use their own choice of adhesive tape on their gloves, subject to approval from the NYSAC.

(e) MBL and Promoter agree that AJ and JM shall submit to any drug testing protocols and procedures required by the NYSAC ("NYSAC Testing") to be administered by the NYSAC.

(f) In addition to the NYSAC Testing, MBL and Promoter agree that AJ and JM shall submit to identical drug testing protocols and procedures to be administered by the Voluntary Anti-Doping Association ("VADA"), including without limitation multiple, random urine and blood tests leading up to and immediately following the Bout ("Additional Testing"). The Additional Testing will begin on signature of this Agreement and continue until the completion of the Bout, and immediately following the Bout if so required by VADA. Both MBL and Promoter agree that MBL shall instruct VADA by separate agreement, to conduct the Additional Testing, and neither party shall unilaterally terminate the agreement with VADA. MBL shall pay for the Additional Testing of both AJ and JM by VADA. VADA shall provide notification of all Additional Testing results to MBL, Promoter, the NYSAC and the World Sanctioning Bodies. AJ and JM shall sign all necessary declarations of consent in favour of VADA to implement such VADA random testing in cooperation with the NYSAC and World Sanctioning Bodies, including but not limited to VADA's standard Athlete Whereabouts Forms. It is also agreed that NYSAC will test first on the night of the Bout followed by VADA. Notwithstanding any other provision of this Agreement to the contrary, MBL and Promoter agree that in the event that AJ and/or JM test positively for a prohibited substance which is subsequently confirmed and as a result of such positive test, the Bout is cancelled and not

PRIVATE & CONFIDENTIAL

rescheduled, neither MBL nor Promoter shall be liable for damages to the other or for any other relief for breach of this Agreement.

## 2.    GRANT OF RIGHTS

(a) Subject to the provisions of this Agreement, Promoter grants to MBL the sole and exclusive right to use and exploit all commercial rights of whatever nature in relation to the Bout, including, without limitation, all right, title and interest in the live-gate receipts from the Bout and the following exclusive worldwide rights in perpetuity relating to that Bout:

(i)     All film, motion picture, radio, television (whether live or delayed, home or theater, pay-per-view, closed circuits, cable or subscription), video and audio cassette and any other media rights, photograph (including raw footage, out-takes and negatives), and program rights (including program sponsorship), now or hereafter developed, in any manner associated with the Bout including, but not limited to, press conferences, publicity events and training sessions ("Pre-Bout Events") and by any and all means, methods and devices now existing or hereafter devised throughout the World;

(ii)    The non-exclusive right to use in any form of media the name, likeness, image and biography of JM and the trainers and other persons associated with JM who are connected with the Bout, for the purpose of advertising, promotion, publicity and commercialization of the Bout and the Pre-Bout Events, all without additional compensation; provided, however, that in no event may such names, likenesses or biographies be used as an endorsement of any commercial product or service other than the Bout and the Pre-Bout Events;

(iii)   Any and all sponsorship and merchandising rights;

(iv)    The right, in MBL's sole discretion, to undertake reasonable and customary actions to ensure the full and complete exercise of the rights granted by Promoter to MBL, including the right to enter into agreements relating to such rights and for the production and promotion of radio and television broadcasts of the Bout and the Pre-Bout Events (including, but not limited to, announcers, commercials, artwork, etc.); and

(v)     The right to sell, assign, license or otherwise commercialize any and all rights granted to MBL under this Agreement (provided MBL remains responsible and primarily liable for its obligations under this Agreement) and to retain all income therefrom.

(b)  MBL grants to Promoter the non-exclusive right to use for promotional purposes only (and for use as part of the telecast of any of Fighter's future bouts) clips of up to the lesser of three (3) minutes or fifty (50) percent of the life of the Bout, in perpetuity. Such rights may only be sub-licensed to media outlets and television networks and may not be exercised until 30 (thirty) days after the Bout, subject in all cases to a courtesy credit. Promoter can use these clips to market future JM bouts and to provide them to television networks and

PRIVATE & CONFIDENTIAL

other media outlets for the purpose of promoting and as part of the telecast of future JM bouts only.

(c) Promoter shall grant to MBL the non-exclusive worldwide right to exhibit clips of up to the lesser of three (3) minutes or fifty (50%) percent of each of JM's previous bouts for the purpose of promoting, as part of the telecast of the Bout, and for shoulder content (unless MBL already holds more extensive rights to such bouts through its affiliates and their prior agreements with Promoter). It is understood MBL shall have the right to sub license such rights to sponsors and broadcasters of the Event for the purpose of promoting and as part of the telecast of the Bout only.

## 3. FINANCIAL CONSIDERATION

(a) In consideration of Promoter providing JM's services for the Bout, MBL shall remit directly to Promoter a provision of services fee in the amount of US$ 6,500,000 (Six Million Five Hundred Thousand US Dollars) ("POS Fee"). Payment of the POS Fee shall be made via wire transfer within three (3) business days after the Bout to bank accounts designated by Promoter less any sanction fees due to the World Sanctioning Bodies as required in accordance with clause 3(f) of this Agreement and the Training Advance (as defined below) (the "Net POS Fee"). Upon the full execution of this Agreement, MBL shall advance to MTP via wire transfer the sum of $50,000 (Fifty Thousand US Dollars) (the "Training Advance") as non-accountable training and maintenance expenses for JM, which shall be immediately refunded by MTP to MBL should the Bout not take place due to any action of JM or Promoter, whether justified or otherwise. Promoter shall be solely responsible for the payment of JM's remuneration in respect of his participation in the Bout and indemnifies MBL in this respect. For the avoidance of doubt, the POS Fee and the PPV Bonus (defined below) shall be the sole consideration and payment(s) due to Promoter (and JM) in respect of the Bout. By April 15, 2019, Promoter shall notify MBL of the amounts (the "Payment Amounts") of the POS Fee that should be paid to SPC, MTP and GCP (respectively, the "SPC Share", "MTP Share" and GCP Share"). The respective Payment Amounts shall be wire transferred to SPC, MTP and GCP in US Dollars within 3 banking days of completion of the Bout; provided, however, that with respect to the Payment Amount being paid to MTP (the "MTP Payment Amount"), MBL shall deduct $377,812.50 (Three Hundred Seventy Seven Thousand, Eight Hundred and Twelve US Dollars and Fifty Cents) (the "Manager Amount") from such MTP Payment Amount and pay to JM's manager, Dean Baker of WMG Management Europe Limited ("Manager") the Manager Amount directly on JM's behalf.

(b) In addition to the POS Fee, Promoter shall also be due a pay-per-view ("PPV") bonus ("PPV Bonus") in the following circumstances:

(i) For every one (1) PPV buy above 700,000 (Seven Hundred Thousand) PPV buys for the Event on Sky Sports Box Office within the United Kingdom and Republic of Ireland, MBL shall pay Promoter a further payment of US $2.50 (Two Dollars Fifty Cents) per buy. For clarity and as an example only, should the Event sell 800,000 PPV buys, Promoter shall be due a PPV Bonus of $250,000 (Two Hundred and Fifty Thousand US Dollars).

(ii) Payment of the PPV Bonus (if applicable) shall be made free from any deductions whatsoever within 14 days of MBL

PRIVATE & CONFIDENTIAL

receiving PPV proceeds from Sky Sports as soon as possible following receipt from Sky Sports. The PPV Bonus that MBL shall pay to SPC, MTP and GCP shall be paid in accordance with Clause 3(a) and allocated and distributed 11.25% to SPC, 11.25% to GCP and 77.5% to MTP (the "MTP PPV Share"); provided, however, that with respect to the MTP PPV Share, MBL shall pay to Manager 7.5% (Seven and One Half Percent) of the MTP PPV Share directly on JM's behalf. At the time that MBL pays the PPV Bonus, MBL shall provide to Promoter copies of any and all PPV reports relating to the Bout that MBL has received (and that have not already been provided to Promoter).

(iii) MBL shall keep true and accurate books of account and records in accordance with generally accepted accounting principles, covering all PPV sales, and shall keep such books of account and records available for at least two (2) years after the date of the Bout or the Rescheduled Bout. Promoter and/or its duly authorized representatives shall have the right, upon at least five (5) days' prior written notice, to request and review all accounting and records reasonably sufficient to show calculation of the PPV Bonus and payments due to Promoter. If the audit discovers an underpayment by MBL, MBL shall, by no later than close of business in London the next working day (subject to any delays caused by complications due to international bank transfers), pay the unpaid amount to Promoter and if such underpayment is more than 5% of the PPV Bonus, MBL shall reimburse Promoter for the reasonable out-of-pocket costs and expenses it incurs in conducting such audit.

(c)     Promoter shall ensure that JM executes any Bout agreement required by the NYSAC or the World Sanctioning Bodies consistent with the terms of this Agreement provided that such Bout agreement does not impose any obligations on Promoter or JM that are inconsistent with this Agreement.

(d)     Subject to clause 3(e) below, MBL shall be responsible for all arrangements and pay for all costs and expenses for the promotion of the Bout (or Rescheduled Bout if applicable) and the Event including, without limitation, all arena costs and expenses, television production and distribution, ticket printing and sales, promotion and marketing, compliance with NYSAC and World Sanctioning Bodies rules and regulations, security, anti-doping testing costs and expenses and insurance policies as required by the NYSAC.

(e)     JM shall be personally liable to pay any and all IBF, WBA, WBO and IBO and local boxing commission fighter/manager related sanction fees. Notwithstanding the foregoing, the parties shall mutually agree upon the declared purse to the World Sanctioning Bodies, and MBL shall pay any and all fighter sanction fees relating to JM's participation in the Bout (but not promoter sanction fees which shall be the sole responsibility of MBL) and deduct such fighter sanction fees in full from the POS Fee payment to Promoter.

(f)     If MBL fails to make a payment due to Promoter under this Agreement by the due date, MBL shall pay interest on the overdue sum from the due date until payment of

PRIVATE & CONFIDENTIAL

the overdue sum, whether before or after judgment.  Interest under this clause 3(f) will accrue each day at 6% per annum compounded daily.

4.    **REMATCH OR OPTION BOUT**

(a)    Should JM be declared the winner of the Bout or the Rescheduled Bout (as defined in clause 10(b) below), it is agreed that MBL shall promote an immediate rematch bout between AJ and JM (and Promoter shall procure that JM shall participate in the rematch) with no interim bouts allowed at a venue and a location to be decided in MBL's sole discretion and on a date in MBL's sole discretion within seven (7) months of the Bout or Rescheduled Bout ("**Rematch Bout**"). For clarity, the Parties understand that should JM not be declared the winner of the Bout or the Rescheduled Bout (e.g., as a result of a loss, draw, no contest, etc.), there shall be no Rematch Bout unless both parties agree to a rematch.  The officials for the Rematch Bout shall be appointed using the same selection criteria as for the Bout in clause 1(c) of this Agreement save that the nationality of the referee shall be subject to the location of the Rematch Bout. JM shall receive all perquisites of champion (as AJ had for the Bout) and the Rematch Bout will be billed as "Miller vs Joshua II" in all media and territories. The terms of the Rematch Bout shall be as follows:

(i) Notwithstanding any failure by the parties to obtain the sanction or recognition of the appropriate boxing authority(ies)/governing body(ies) or the fact that a boxing authority/governing body might strip either fighter of any Championship, the Rematch Bout shall still go ahead for JM's remaining Championships, or even in circumstances where no Championships are being fought for. Nevertheless, both parties agree that they will use their reasonable endeavours to seek an immediate exception (subject to MBL paying any applicable fees and expenses to file for such exception(s)) if required from any and all World Sanctioning Bodies following the Bout or Rescheduled Bout for the Rematch Bout to be recognised for the IBF, WBA, IBO and WBO World Heavyweight Championships.

(ii) Subject to clause 4(a)(v) below, the Rematch Bout shall take place within seven (7) months of the date of the Bout or Rescheduled Bout ("Rematch Long Stop Date").

(iii) Promoter and MBL hereby agree the Net Profit of the Rematch Bout will be split 60% (Sixty Percent) to MBL and 40% (Forty Percent) to Promoter. In the event that the Net Profit of the Rematch Bout is less than US$27,500,000.00 (Twenty-Seven Million Five hundred Thousand US Dollars) MBL shall guarantee that Promoter shall receive a minimum guarantee of US$11,000,000 (Eleven Million US Dollars) (less any applicable withholding taxes/sanctioning fees) ("Rematch POS Fee").

(iv) Net Profit ("Net Profit") shall be determined in accordance with generally accepted accounting principles, consistently applied and be defined as all gross revenues generated by the Rematch Bout from any and all rights to the Rematch Bout from all worldwide sources relating to the Rematch Bout and exploitation of all ancillary rights including, without limitation of the foregoing, all live gate revenues,

PRIVATE & CONFIDENTIAL

all worldwide television revenue in all media, and all sponsorship and merchandising revenues after deducting all budgeted expenses as set out in a budget (the "Budget") which the parties shall mutually agree in good faith on confirmation of the location of the Rematch Bout. Promoter shall be entitled to reasonable review of all contracts in relation to the Rematch Bout and any commercial partnership or contract entered into in relation to the Rematch Bout that have any material financial effect on the Budget or the financial outcome of the Rematch Bout. MBL shall retain all operational and financial control of the Rematch Bout.

(v) Following the Bout or the Rescheduled Bout, or the scheduling of a Rematch Bout as the case may be, in the event that either boxer is injured and is or reasonably believes he may be unable to participate in the Rematch Bout by the Rematch Long Stop Date, they will immediately seek medical advice from a physician licensed by their local commission and if a physician licensed by the British Boxing Board of Control ("BBBoC") certifies that AJ is mentally or physically disabled or a physician licensed by the NYSAC certifies that JM is mentally or physically disabled, to such an extent that one or both cannot participate in the Rematch Bout by the Rematch Long Stop Date then the Rematch Bout shall be rescheduled to a date on which DAZN, Sky Sports, MBL and Promoter can mutually agree to and the Rematch Long Stop Date may be extended by up to two (2) months to accommodate a rescheduled Rematch Bout. Upon receipt of such notification, MBL shall have the right to elect an independent physician to certify such mental or physical disability of JM, to be paid for by MBL. Upon receipt of any such notification, Promoter shall have the right to elect an independent physician to certify such any mental or physical disability of AJ, to be paid for by Promoter. The parties will within 14 (fourteen) days of notification of any such withdrawal agree a rescheduled date for the Rematch Bout. A boxer that fails to seek immediate medical advice or obtain the certification detailed above shall not be excused from the participation in the Rematch Bout.

(vi) In the event that the Rematch Bout is delayed or prevented from occurring on the scheduled date by reason of an act of God, fire, flood, war, civil unrest, public disorder, power failure, other calamity, strike or labour difficulties and any governmental or boxing or athletic commission or association enactment, determination or action regulation or order, the Rematch Bout must nonetheless be rescheduled no later than within seven (7) months of the Bout or Rescheduled Bout on a date on which DAZN, Sky Sports, MBL and Promoter shall mutually agree, subject to any extension for an injury to either fighter pursuant to clause 4(a)(v) above.

(vii)   Should JM be declared the winner of both the Bout and the Rematch Bout, MBL shall have the option in MBL's sole discretion to promote JM's next fight after the Rematch Bout in a location to be decided in MBL's discretion within seven (7) months of the

PRIVATE & CONFIDENTIAL

Rematch Bout against an opponent to be mutually agreed (the "Defense"). MBL shall within 30 days of the Rematch Bout confirm whether they wish to promote the Defense by providing written notice to Promoter. Should MBL exercise their right to promote the Defense, MBL shall remit directly to Promoter a minimum provision of services fee in the amount of US$ 17,500,000 (Seventeen Million Five Hundred Thousand US Dollars) (less any applicable withholding taxes/sanctioning fees) (the "Defense POS Fee") following the Defense taking place. MBL also agrees to pay opponent expenses in relation to the Defense as well as travel, lodging, tickets and reasonable expenses for JM and his team and the mutually approved opponent.

(viii)   Should JM not be declared the winner of the Bout or the Rescheduled Bout or in case of a draw, MBL shall promote JM's next two fights after the Bout or the Rescheduled Bout on dates within 12 (twelve) months of the Bout or the Rescheduled Bout in a location to be decided in MBL's discretion (the "Option Bouts" and "Option 1" and "Option 2" respectively). The opponents for the Option Bouts shall be mutually agreed between the parties. MBL shall pay Promoter a provision of services fee of *(i)* US$ 1,250,000 (One Million Two Hundred and Fifty Thousand) for Option 1; and *(ii)* US$ 1,500,000 (One Million Five Hundred Thousand) for Option 2 for providing the services of JM for the Option Bouts (in each case less any applicable withholding taxes/sanctioning fees) and Promoter shall be liable to pay JM's purse for the Option Bout. MBL also agrees to pay additional reasonable opponent expenses in relation to the Option Bouts as well as travel, lodging, tickets and reasonable expenses for JM and his team and the mutually approved opponent.

(ix) Any breach of this clause by one party is likely to cause the other substantial and irrevocable damage. In the event of any such breach by one party the other shall have the right to injunctive relief to prohibit such breach in addition to such other remedies that may be available. Notwithstanding the foregoing, the purpose of this Agreement is not to act as an unfair restraint or otherwise prevent either party from fighting and earning a living due to the injury or inactivity of the other.

If applicable and following the Rematch Bout, Defense or Option Bouts and payment under the terms detailed above, neither party shall be due any further remuneration from each other.

5.     **AIR TRAVEL**

(a)     For the Bout or Rescheduled Bout, MBL shall provide up to, if necessary, nine (9) round trip airline tickets for Promoter/JM from their home city/city of JM's training camp to the city of the Bout or the Rescheduled Bout, three (3) of which shall be Business Class and six (6) (1 of which shall be provided to each of SPC and GCP) of which shall be Economy/Coach Class.

PRIVATE & CONFIDENTIAL

(b)      For the Option Bouts (if applicable), MBL shall provide up to, if necessary, seven (7) round trip airline tickets for Promoter/JM from their home city/city of JM's training camp to the city of the Option Bouts, one (1) of which shall be Business Class (or above) and six (6) (1 of which shall be provided to each of SPC and GCP) of which shall be Economy/Coach Class.

(c)      For the Rematch Bout or Defense (if applicable), MBL shall provide up to, if necessary, fourteen (14) round trip airline tickets for Promoter/JM from their home city/city of JM's training camp to the city of the Rematch Bout and Defense, four (4) of which shall be Business Class (or above) and ten (10) (2 of which shall be provided to each of SPC and GCP) of which shall be Economy/Coach Class.

## 6.      TRANSPORT, LODGING AT SITE AND TICKETS

(a)      MBL shall furnish Promoter and JM with ten (10) hotel rooms of which three (3) suites and seven (7) standard rooms (2 of which shall be provided to each of SPC and GCP) for up to seven (7) nights prior to the Bout and/or the Rescheduled Bout, as applicable, at a first class hotel close to the Venue.

(b)      For the Option Bouts (if applicable), MBL shall furnish Promoter and JM with seven (7) hotel rooms of which one (1) will be a suite and six (6) (1 of which shall be provided to each of SPC and GCP) will be standard rooms for up to five (5) nights prior to the Option Bout at a first class hotel close to the Venue.

(c) For the Rematch or a Defense, MBL shall furnish Promoter and JM with fourteen (14) hotel rooms of which four (4) will be suites and ten (10) will be standard rooms (2 of which shall be provided to each of SPC and GCP) for up to seven (7) nights prior to the Rematch Bout and Defense Bouts at a hotel close to the Venue.

(d)      MBL shall provide JM and Promoter with the following complimentary tickets for the Bout, and the Rematch Bout or the Rescheduled Bout -

  i.   15 (Fifteen) x P1 (Inner Ringside) Seats split as follows –
       (i) 4 (four) in the promoters front row (VIP on camera) of which three (3) shall be allocated to SPC and GCP and one (1) to MTP;
       (ii) 3 (three) in the seats immediately behind the tickets in (i) of which two (2) shall be allocated to SPC and GCP and one (1) to MTP;
       (iii) 4 (four) in the front row in JM's corner, which shall be allocated to MTP; and
       (iv) 4 (four) in the second row in JM's corner, which shall be allocated to MTP;
  ii.  10 (ten) x P2 Seats, of which two (2) shall be allocated to SPC and GCP and eight (8) to MTP;
  iii. 10 (ten) x P3 Seats, of which two (2) shall be allocated to SPC and GCP and eight (8) to MTP; and
  iv.  10 (ten) x P4 Seats, of which two (2) shall be allocated to SPC and GCP and eight (8) to MTP;

PRIVATE & CONFIDENTIAL

(e)    For the Rematch, Option Bouts or Defense (each as applicable), MBL shall provide JM and Promoter with a reasonable number of complimentary tickets to be negotiated in good faith.

(f)    Prior to tickets to the Bout being made available for sale to the public, Promoter shall have the right to purchase tickets to the Bout at full face value. MBL has sent Promoter a seating plan outlining face values, from which the Promoter shall have until midday (ET) on Wednesday, February 13, 2019 to select the price points and quantity of tickets they wish to purchase (subject to availability), but in any event MTP, SCP and GCP shall have the right to purchase a reasonable number of tickets.

Once an order has been placed, the purchased tickets shall be promptly provided to Promoter and paid for via deduction from the POS Fee due to Promoter, as follows:

i.    in the event such tickets are purchased by or on behalf of SPC, the purchase price shall deducted from the SPC Share;
ii.    in the event such tickets are purchased by or on behalf of GCP, the purchase price shall deducted from the SPC Share; and/or
iii.    in the event such tickets are purchased by or on behalf of MTP, the purchase price shall be deducted from the MTP Share.

Once the order has been received the tickets are sold and not provided on a consignment basis, meaning that Promoter shall be liable for the full sum due.

(g)    MBL shall provide JM and Promoter with a total of up to 26 (twenty-six) credentials (subject to approval by the NYSAC) which shall include JM and his corner team. In total JM shall receive 18 (eighteen) of these passes and SPC and GCP shall receive 8 (eight) of these passes. It is agreed that only JM's corner team of four (4), four (4) promotional representatives and the Manager shall have access to the ring prior to and after the Bout or the Rescheduled Bout, the Rematch, Defense and/or Option Bouts. The credentials will be full working passes depending on the needs of the individuals being granted the credential.

## 7.    PUBLICITY AND PUBLIC RELATIONS

The Bout shall be billed as 'Eddie Hearn for Matchroom Boxing in association with AJBXNG, Salita Promotions, Miller Time Promotions and Greg Cohen Promotions proudly present' in all promotional billing and the Bout will be billed as "JOSHUA V MILLER" in all territories. It is agreed that the logos for Salita Promotions, Miller Time Promotions and Greg Cohen Promotions shall be included on all promotional materials, and in JM's locker room and lighting truss, it being understood that MBL is the lead promoter and will have first choice of locations. Promoter shall ensure that JM fully cooperates and assists in the advertising, publicity and promotion of the Bout, including appearing at such reasonable number of live and telephone press conferences, interviews and other promotional activities as MBL may reasonably designate, provided that such promotional activities do not unreasonably interfere with JM's training schedule. These shall include but not be limited to the following;

(a)    **Bout Announcement**

(i)    Both AJ and JM will appear at a press conference in New York on Tuesday 19th February 2019 (or such other date to be decided by MBL). MBL shall provide JM with three (3) hotel rooms in a first class hotel (of which one (1) will be a suite) if necessary and, if necessary, three (3) flights, of which two (2) shall be in Business class (or above) and one (1) shall be in economy to

PRIVATE & CONFIDENTIAL

attend the press conference.  In addition, JM shall be permitted to have two (2) private security personnel attend the press conference (at no cost to MBL). Additionally, MBL shall provide SPC with one hotel room.

(ii)      Up to 3 days of press activities in New York following the press conference including but not limited to – TV show appearances (morning and late night shows), media roundtables, radio and podcast interviews, event visits.

(iii)      Following the U.S. announcement, both AJ and JM will appear at a press conference at a location and on a date to be decided by MBL in the UK in consultation with Promoter provided said UK press conference is scheduled to take place before March 1, 2019. MBL shall provide JM with three (3) hotel rooms in a first class hotel (of which one (1) will be a suite) if necessary and, if necessary, three (3) flights, of which two (2) shall be in Business class  (or above) and one (1) shall be in economy to attend the press conference.  In addition, JM shall be permitted to have two (2) private security personnel attend the press conference (at no cost to MBL).  Additionally MBL shall provide SPC and GCP with one (1) economy class and one (1) business class flight and two hotel rooms for the UK press conference.

(iv)      Promoter agrees that neither JM nor Promoter shall announce the Bout  before MBL or AJ announce the Bout. Following MBL and AJ's announcement Promoter and JM shall be free to announce the Bout by their own means. Should JM announce the Bout prior to AJ and/or MBL the MTP Share of the POS Fee shall be reduced by $200,000 (Two Hundred Thousand US Dollars) and should SPC or GCP (or any of their employees or representatives) announce the Bout prior to AJ and/or MBL the SPC or GCP Share of the POS Fee shall be reduced by $200,000 (Two Hundred Thousand US Dollars).

**(b)      Fighter's Camp**

(i)      One (1) open training session at JM's training camp with worldwide media and Event broadcasters and partners prior to arrival in the venue city;

(ii)      Four (4) exclusive interviews at JM's camp with the US and UK broadcaster;

(iii)One (1) day of press activities in New York including but not limited to – TV show appearances (morning and late night shows), media roundtables, radio and podcast interviews, event visits provided that such activities are scheduled to take place before April 30, 2019.

(iv)      Reasonable access for the US broadcaster of the Bout to film a behind the scenes documentary, including four (4) days filming at JM's camp.

(v)      Reasonable access for the UK broadcaster of the Bout to film a behind the scenes documentary. Including four (4) days filming at JM's camp. MBL shall use best endeavours to cause the UK and US broadcasters to coordinate their productions to minimize the disruption to JM's camp.

PRIVATE & CONFIDENTIAL

(c) **Fight Week Obligations** – It is understood JM and AJ shall be required to be in the city of the Bout for the six (6) days prior to the Bout, including the day of the Bout to fulfil the following obligations:

(i) VIP Kick off party
(ii) Public Work Out;
(iii) Up to four (4) exclusive interviews with the US and UK broadcaster (not to exceed 90 minutes per interview).
(iv) Official press conference;
(v) A media session to include one-on-ones with television, radio, print and on-line media once in the venue city (not to exceed 3 hours);
(vi) Public weigh-in; and
(vii) Fighter meeting with US and UK TV if required.

(d) **US Host Broadcaster Requirements** – set out in **Schedule 1** of this Agreement. It is expressly acknowledged and agreed that any requirements of US Host Broadcaster during Fighter's camp for any Bout under this Agreement are subject to his reasonable prior training commitments and that Fighter shall not be required to leave camp at any time in order to fulfil any such requirements.

In addition to the foregoing, MBL shall also provide up to 2 airfares (which shall be economy class) for SPC and GCP and 2 hotel rooms for any promotional activities requiring travel which is not specifically addressed above. In the event there is a dais for the applicable promotional activity, MBL shall provide a seat with a name placard on such dais for Dmitiry Salita ("Salita") and Greg Cohen ("Cohen"). At all promotional activities, MBL shall invite both Salita and Cohen to speak at such promotional activity. Additionally, with respect to any and all press releases issued by MBL regarding the Bout, MBL shall include a quote from both Salita and Cohen.

(e) Promoter agrees that any commercial or promotional material of any kind on or about JM, the clothing of JM or other personnel appearing in the ring such as trainers (other than normal size manufacturers' labels) during the Bout shall not be:

(i) of a direct competitor of DAZN and/or Sky Sports (including any person who is operating a sport media or sport news service, whether fixed line, free to air, online, Free, PPV or otherwise);

(ii) of any sexual nature;

(iii) relate to the sale of tobacco products; and

(iv) lewd, generally offensive or otherwise inappropriate for exhibition.

For the purpose of this clause Promoter shall provide the name and logos of all sponsors contemplated to appear on any ring apparel of JM as well as his associated cornermen and team members to MBL for review no later than fourteen (14) days prior to the date of the Bout. MBL shall provide its decision and rationale on whether or not to authorize the proposed logos sponsors within 48 (forty-eight) hours of receiving the proposals, such authorization not to be unreasonably withheld, delayed or conditioned. In the event that Promoter does not comply with the notice provision set out in the clause, MBL shall be entitled in its absolute discretion to reject the proposed logos or sponsors. For the avoidance of doubt, all sponsorship under this clause must comply with applicable law, in particular New York State and Federal law regulation of gambling and sports betting advertisement.

PRIVATE & CONFIDENTIAL

8.      **MEDICAL AND OTHER COMPLIANCE REQUIREMENTS**

MBL, with respect to AJ, and Promoter, with respect to JM, shall cooperate fully to ensure that all medical examinations and other testing of its fighter is undertaken prior to the Bout and likewise address all related matters in preparation for the Event to ensure full compliance and with the NYSAC and World Sanctioning Bodies regulations. In addition, it is agreed that Promoter and MBL shall fully cooperate to ensure all required medical documentation is available to allow the other party the opportunity to arrange adequate insurance policies for the Event. The costs of any medicals required to ensure compliance as outlined in this clause shall be paid by MBL.

9.      **ASSIGNMENT**

Neither party shall have the right to assign any rights or obligations under this Agreement without the express written consent of the other party.

10.     **RESCHEDULING**

(a)     Promoter agrees that JM, and MBL agrees that AJ, will not engage in any professional boxing match, combat sport or exhibition prior to the date of the Bout.

(b)     If the Bout is prevented from taking place on the scheduled date by reason of any act of God, fire, flood, riot, war, public disaster, unavailability of the Venue, fighter unavailability, cancellation or postponement of the telecast, or any other cause or event beyond the control of MBL or Promoter, or if either AJ or JM shall become incapacitated by reason of any mental disability, physical injury or illness which prevents their participation in the Event on the scheduled date in the opinion of a physician licensed by the BBBoC in the case of AJ (or the NYSAC if AJ is incapacitated after he arrives in the U.S. the week before the Bout) or a physician licensed by the NYSAC in the case of JM, then MBL shall have the right to terminate this Agreement, unless MBL elects in its sole discretion to reschedule the Bout to a date within seven (7) months of the originally scheduled date of the Bout ("Rescheduled Bout"). If MBL reschedules the Bout, MBL must notify Promoter of such decision within fourteen (14) days of notification of any postponement. In the event of such postponement, all of the provisions of this Agreement shall remain in full force and effect during the period of such extension and on the rescheduled date of the Bout. If the Bout is canceled for the reasons set out above, then this Agreement shall terminate, and the parties shall have no further obligations to each other.

(c)     The parties shall promptly notify one another if they learn of the occurrence of any event which gives rise to, or could reasonably be expected to give rise to, the postponement or rescheduling of the Bout. MBL shall have fourteen (14) days to elect to reschedule the Bout, such period to be reasonably extended in the event that MBL reasonably requests additional time to arrange the postponement.

PRIVATE & CONFIDENTIAL

(d)     If MBL reschedules the Bout and such Rescheduled Bout is within three (3) months of the original date of the Bout, neither party shall have the right to an interim bout (an "Interim Bout"). If MBL reschedules the Bout for a date which is after three (3) months from the original date of the Bout but within the seven (7) month period, the non-incapacitated fighter (or both fighters if neither is incapacitated but the Bout is postponed due to an Act of God, for example) shall have the right to participate in an Interim Bout on or within four (4) weeks of the original date of the Bout. In the case of AJ, such Interim Bout will be promoted solely by MBL and MBL shall be solely responsible for all costs and expenses of such Interim Bout. In the case of JM, such Interim Bout will be promoted solely by Promoter and Promoter shall be solely responsible for all costs and expenses of such Interim Bout. MBL's decision on rescheduling must be made within fourteen (14) days of the event causing the need to reschedule and MBL must notify Promoter of MBL's decision within two (2) days of such decision. In the event that a figher participating in an Interim Bout loses such Interim Bout, the promoter of the other fighter shall have the right to terminate this Agreement and upon such termination, neither party shall have any further rights or obligations hereunder.

## 11.    REPRESENTATIONS AND WARRANTIES

(a)     Promoter and JM represent and warrant to MBL as follows:

(i)     Promoter has the sole and exclusive right to provide the professional boxing services of JM and the assignment and/or licence of such rights hereunder to MBL for the Bout, Rescheduled Bout, Rematch Bout, Defense and/or Option Bout is legally enforceable, and to secure JM's participation in the Bout and Rematch Bout, Rescheduled Bout, Defense and/or Option Bouts on the terms and conditions set out in this Agreement.

(ii)     Promoter solely and exclusively owns and controls the right to use JM's name, likeness, image and other image rights in connection with the Bout, and shall grant, and have the right to grant, a royalty-free irrevocable licence of such rights to MBL for the purposes of this Agreement;

(iii)     Neither Promoter nor JM has entered, or will prior to the Bout, Rescheduled Bout, Rematch Bout, Defense, and/or Option Bout enter into any agreement, which might affect or interfere with full and complete performance by Promoter and JM of their respective obligations under this Agreement, the participation of JM in the Bout, Rematch Bout, or Rescheduled Bout or the unimpaired use, exercise and exploitation by MBL of any of the rights granted under this Agreement.

(iv)     There are no pending claims affecting Promoter or JM which would interfere with the full and complete exercise or enjoyment by MBL of any rights granted under this Agreement and that Promoter has not executed any agreement which conflicts with the provisions of this Agreement or which purports to grant anyone else conflicting rights which would interfere with the full and complete performance by Promoter or JM of their respective obligations under this Agreement or the unimpaired exercise by MBL of any rights granted under this Agreement. Notwithstanding the foregoing, MBL understands that the WBA has ordered JM to fight Trevor Bryan for the WBA interim heavyweight title and scheduled a purse bid for such bout. The Parties understand and agree that this shall have no

PRIVATE & CONFIDENTIAL

impact on either the Promoter or JM's ability to comply with the terms of this Agreement provided the WBA agrees to sanction the Bout.

(b)      MBL represents, warrants and covenants to Promoter as follows:

(i)      MBL has the exclusive right to provide the professional boxing services of AJ and secure his participation in the Bout and Rematch Bout or Rescheduled Bout on terms and conditions consistent with this Agreement.

(ii)      MBL will not prior to the Bout, Rematch Bout or Rescheduled Bout enter into any agreement which might interfere with the full and complete performance by MBL and AJ of their obligations under this Agreement.

(iii)      MBL has the full right, power and authority and is free to enter into this Agreement and has not heretofore and will not hereafter enter into any contract, agreement or understanding, whether oral or written, which conflicts in any material respect with the provisions hereof or which purports to grant similar or conflicting rights to any person, firm, or entity other than Promoter, or which would or might interfere with MBL's or AJ's full and complete performance hereunder or the free and unimpaired exercise by Promoter of any of the rights granted to Promoter under this Agreement. There are no pending claims affecting MBL or AJ which would interfere with the full and complete exercise or enjoyment by Promoter of any rights granted under this Agreement.

(c)      Each of SPC, MTP and GCP represents, warrants and covenants to MBL that each of SPC, MTP and GCP will be jointly and severally liable for any Promoter obligations under this Agreement and for any acts and/or omissions of Promoter.

## 12.      INDEMNIFICATION AND LIABILITY

(a)      MBL shall indemnify, defend and hold harmless Promoter and its officers, directors, employees or representatives from any and all claims, costs liabilities, judgments, expenses or damages (including reasonable attorneys fees) arising out of (i) its breach of this Agreement or any representation or warranty by MBL contained herein or (ii) any act or omission by MBL giving rise to a claim against Promoter.

(b)      Promoter and JM shall indemnify, defend and hold harmless MBL and its officers, directors, employees or representatives from any and all claims, costs liabilities, judgments, expenses or damages (including reasonable attorneys fees) arising out of (i) its breach of this Agreement or any representation or warranty by Promoter and/or JM contained herein or (ii) any act or omission by Promoter and/or JM giving rise to a claim against MBL.

(c)      In any case in which indemnification is sought hereunder:

(i)      The party seeking indemnification shall promptly notify the indemnitor in writing of any claim or litigation to which this clause 12 relates; and

(ii)      The indemnities shall afford the indemnitor the opportunity to participate in, and at the sole discretion of the indemnitor, agree upon any compromise, settlement, limitation or other resolution or disposition of such claim or litigation.

(d)      Nothing in this Agreement shall exclude or restrict either party's liability for fraud or fraudulent misrepresentation.

PRIVATE & CONFIDENTIAL

13.   **TERMINATION**

(a)   MBL shall have the right to terminate this Agreement with immediate effect by written notice to Promoter, if JM is charged or found guilty of having committed a doping offence or tests positive for any banned substances by either WADA or VADA during the Term of this Agreement, or is suspended from boxing by any boxing authority for a serious breach of the rules, or retires.

(b)   Promoter shall have the right to terminate this Agreement with immediate effect by written notice to MBL, if AJ is charged or found guilty of having committed a doping offence or tests positive for any banned substances by either WADA or VADA during the Term of this Agreement or is suspended from boxing by any boxing authority for a serious breach of the rules, or retires.

(c)   Either party shall have the right to terminate this Agreement with immediate effect by written notice to the other:

(i)   if the Bout, or the Rescheduled Bout is cancelled or postponed due to the other party being unable to participate for any reason other than an injury or illness (save for a career ending injury);

(ii)   if the NYSAC fails to sanction the Bout; or

(iii)   if the Rematch Bout does not take place by the Rematch Long Stop Date.

(d)   Either MBL or Promoter shall have the right to terminate this Agreement with immediate effect by written notice to the other parties if MBL or AJ, in the case of Promoter giving notice, or Promoter or JM, in the case of MBL giving notice, commits a material breach of this Agreement and, if capable of remedy, such breach is not remedied within 14 (fourteen) days (or such lesser period as is reasonably determined by the party giving notice by reference to the seriousness of the breach and the remaining time to the Bout) of the giving of notice of such breach.

(e)   Such rights of termination shall not prejudice any claim for breach of contract, estoppel or the parties' other strict legal rights.

(f)   MBL shall have the right to terminate this Agreement with immediate effect by MBL given written notice to Promoter:

(i)   in accordance with clause 10(b); or

(ii)   if the NYSAC doesn't approve the officials selection process in accordance with clause 1(c).

14.   **MISCELLANEOUS**

(a)   Entire Agreement:   This Agreement sets forth, and is intended to be an integration of, all agreements, understandings, representations and warranties between the parties with respect to the subject matter of this Agreement, and there are no agreements,

PRIVATE & CONFIDENTIAL

understandings representations or warranties, oral or written, express or implied, between the parties with respect to the subject matter of this Agreement other than as set forth herein.

(b)     Amendment Waiver:  No amendment of this Agreement shall be valid unless in writing and signed by both parties.  No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person against whom it is sought to be enforced.

(c)     Confidentiality: The terms and conditions of this Agreement shall remain confidential between the parties, and shall not be disclosed to the media or general public, or to any other third party (other than such party's employees and agents (including consultants), in their capacity as such, on a need-to-know basis), except:  (i) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction, in which event(s) the party seeking disclosure shall so notify the other party as promptly as practicable (if possible, prior to making such disclosure) and shall seek confidential treatment of such information, (ii) as part of normal reporting or review procedure to banks, auditors and attorneys and similar professionals, provided that such banks, auditors and attorneys and similar professionals agree to be bound by the provisions of this Section, and (iii) in order to enforce a party's rights pursuant to this Agreement.

(d)     Severability:   If any provision of this Agreement is held invalid, illegal or unenforceable for any reason by any court or tribunal of competent jurisdiction, such provision shall be severed and the remainder of the provisions of this Agreement shall continue in full force and effect as if this Agreement had been executed with the illegal or unenforceable provision eliminated.  Any modification to or deletion of a provision or part-provision of the Agreement under this clause shall not affect the validity and enforceability of the rest of this Agreement.

(e)     Further Assurances:   Each party agrees from time to time to perform such further acts and execute and deliver such other documents as may be reasonably requested by the other party to carry out the intent and purpose of this Agreement including, without limitation, a standard NYSAC (or other applicable sanctioning body) contract between JM and Promoter in such form as may be required by the NYSAC (or other applicable sanctioning body); provided that the provisions in the said standard contract shall not modify any terms of this Agreement or impose additional obligations on JM and/or Promoter.

(f)     Counterparts: This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same documents, and any party may execute this Agreement by signing any one or more of such counterparts.

(g)     Governing Law: This Agreement shall be governed by and construed in all respects in accordance with the laws of England and Wales and the parties hereby submit to the exclusive jurisdiction of the English courts.

(h)     Each party expressly acknowledges and agrees that any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims) shall be dealt with before the English courts and no party shall seek to challenge the exclusive jurisdiction of the English courts hereunder.

(g)     Assumption of Risk and Limitation of Liability: JM and Promoter both understand and agree that boxing is a dangerous sport and that injuries, sometimes serious injuries, and even fatalities can occur as a consequence of a Bout notwithstanding the best

PRIVATE & CONFIDENTIAL

efforts of MBL to ensure appropriate and adequate health and safety measures are put in place. JM, MBL and Promoter hereby agree (and shall cause their respective fighters to agree) that neither MBL nor Promoter will be liable for any damages whatsoever, including direct, indirect, incidental, special, consequential, punitive or exemplary damages arising from, relating to or connected with the actual boxing match between AJ and JM, including, but not limited to, losses to Promoter or MBL or other third parties caused by injury or death of JM or AJ, respectively. This clause shall be construed broadly to provide a release and waiver of any liability accruing to MBL or Promoter to the maximum extent permissible under applicable law. Notwithstanding the above, MBL warrants that it shall comply with all health and safety requirements of the NYSAC and the World Sanctioning Bodies.

(h)     Legal Costs: Each party shall meet its own legal costs in relation to the preparation and negotiation of this Agreement.

(i)     Third Party Beneficiaries: The provisions of this Agreement are for the exclusive benefit of MBL and Promoter and their permitted successors and assigns, no third party shall be a beneficiary of, or have any rights by virtue of, this Agreement (whether or not such third party is referred to herein).

(j)     Notices: Any notice required or desired to be given hereunder shall be in writing and sent postage prepaid by certified mail or email, to the addresses as follows:

        (i)     Matchroom Boxing Limited
             Mascalls Lane
             Brentwood, Essex CM14 5LJ
             Frank.smith@matchroom.com

        (ii)    **Salita Promotions, Corp.**
             Dmitriy Salita
             3512 Quentin Road, Suite 204
             Brooklyn
             New York, NY
             11234
             ds@salitapromotions.com

             **Miller Time Promotions LLC**
             Jarrell Miller
             600 South Dixie Highway #151
             West Palm Beach, Florida, Fl, 33401
             Kingmillerboxing@gmail.com

             with a copy to the Manager:
             Dean Baker
             WMG Management Europe Limited
             7th Floor, Aldwych House, 71-91 Aldwych
             London WC2B 4HN
             dbaker@teamwass.com

             Greg Cohen Promotions, LLC
             350 Fifth Avenue 68th Floor
             New York NY 10118

PRIVATE & CONFIDENTIAL

Gcohen@gcpboxing.com

All such notices shall be deemed given when emailed or delivered to the above respective email and physical addresses.

The parties have executed this Agreement as of the date first above written.

**MATCHROOM BOXING LIMITED.**

13/02/2019          By: _____
Date

Frank Smith, CEO

**SALITA PROMOTIONS CORP.**

_____          By: _____
Date

Name -

**MILLER TIME PROMOTIONS LLC**

2/12/2019          By: _____
Date

Name -

**GREG COHEN PROMOTIONS LLC**

02/12/19          By: _____
Date

Name - Gregory Cohen, CEO

PRIVATE & CONFIDENTIAL

Gcohen@gcpboxing.com

All such notices shall be deemed given when emailed or delivered to the above respective email and physical addresses.

The parties have executed this Agreement as of the date first above written.

**MATCHROOM BOXING LIMITED.**

_____  By: _____
Date

Eddie Hearn, Managing Director

**SALITA PROMOTIONS CORP.**

Feb 12, 2019  By: _____
Date

Name -  Dmitriy Salita

**MILLER TIME PROMOTIONS LLC**

_____  By: _____
Date

Name -

**GREG COHEN PROMOTIONS LLC**

_____  By: _____
Date

Name -

PRIVATE & CONFIDENTIAL

## RATIFICATION AND CONSENT

To: Matchroom Boxing Limited

I, Jarrell Miller, have read and am familiar with all the terms of the Provision of Services of even date Agreement (the "Agreement") and as a material inducement to you to enter into the Agreement and for other good and valid consideration, I hereby warrant, represent and undertake to you that :

1.  I consent to the execution thereof, ratify and confirm in my individual capacity all terms and conditions thereof;

2.  I agree to be bound by all terms and conditions thereof that relate to me as an individual; and

3.  I agree that I shall render all services and grant all rights as are necessary to enable Salita Promotions Corp. , Miller Time Promotions, LLC and Greg Cohen Promotions, LLC to comply with their obligations under said Agreement.

4.  I shall procure that Salita Promotions Corp. , Miller Time Promotions, LLC and Greg Cohen Promotions, LLC shall meet all their obligations under the Agreement and that, if the arrangement set out at paragraph 3 above ceases, or Salita Promotions Corp. , Miller Time Promotions, LLC and/or and Greg Cohen Promotions, LLC cease to exist or otherwise fail or are unable to duly observe and perform their obligations under the Agreement, I shall continue to grant to you, the rights set out in the Agreement, perform the services and comply with the restrictions relevant to me and other obligations of Salita Promotions Corp. , Miller Time Promotions, LLC and Greg Cohen Promotions, LLC set out in the Agreement and, if requested by you, shall enter into an agreement with you in place of Salita Promotions Corp. , Miller Time Promotions, LLC and/or Greg Cohen Promotions, LLC on the same terms as the terms of the Agreement.

5.  This letter shall be governed by and construed in all respects in accordance with the laws of England and Wales and the parties hereby submit to the exclusive jurisdiction of the English courts.

Dated: 2/12/2019

Jarrell Miller

PRIVATE & CONFIDENTIAL

**Schedule 1**
PROMOTION, ACCESS AND ADVERTISING SERVICES

This Schedule shall apply to the Bouts contemplated under this Agreement (each of the Bout and/or Rematch Bout and/or Defense and/or Option Bouts).

1.      **Social Media and Website**

   a.   JM ( "Fighter") shall publish twenty (20) organic posts (relating to the Bouts, DAZN, or Matchroom at Matchroom's reasonable direction and in consultation with Matchroom and DAZN) via all active public personal media channels in the month leading up to the Bouts pursuant to the below schedule:

   1.   commencing five (5) weeks prior to each Bout and ending two (2) weeks prior to each Bout, publish at least two (2) organic posts per week; and

   2.   commencing two (2) weeks prior to each Bout (and up to the actual Bout), publish at least one (1) organic post per day,

   (together, the "Social Media Posts");

   b.   The Social Media Posts shall include:

   i.   at least two (2) organic posts on the date of each Bout including promotional content promoting the DAZN service;

   ii.   two (2) organic posts in each calendar month that a Bout is not taking place during the Term (relating to material at Matchroom's reasonable direction and in consultation with Matchroom and DAZN);

   iii.   re-posts and/or re-tweets and/or likes of social posts from official DAZN social media platforms at regular intervals;

   c.   The Fighter shall provide DAZN with advertiser level access to the Fighter's public social media channels to allow for the creation, scheduling, and promotion of posts with paid support (subject to the approval of the Fighter on a case-by-case basis acting reasonably).

   d.   The Figher shall use his reasonable endeavours to:

   i.   make himself available to participate in 'social media takeovers' on official DAZN social media platforms upon DAZN giving the Fighter reasonable notice;

   ii.   make himself available to participate in a "Q and A" session on Instagram, Facebook and/or Twitter and/or official DAZN social media platforms in connection with each Bout; and

   iii.   include the DAZN logo and a hyperlink to the DAZN website on the fighter's official website (if any) in a position which is no less prominent than the logo of other fighter partners.,

PRIVATE & CONFIDENTIAL

subject always to the Fighter's reasonable prior training commitments and prior written agreement.

## 2. Personal Appearances

a. The Fighter shall:

   i. make two (2) non-Bout related personal appearances during each of 2019 and 2020; and

   ii. make two (2) personal appearances during each of 2019 and 2020 at major non-boxing DAZN broadcast events (e.g. MLB World Series, the UEFA Champions League Final, NFL Super Bowl, etc.); and

b. The Fighter shall in relation to every Bout, attend and/or participate in the following:

   1. a satellite media tour (Four (4) Hours), which for the avoidance of doubt, shall include media from all DAZN markets, as well as DAZN's internal crews;

   2. Five (5) on-location/in-studio media appearances (e.g., late night and/or morning talk show, Sportscenter, etc.);

   3. Participation in two "PR Stunts" as reasonably requested;

   4. Participation in grand arrivals, workout, press conference, Media lunch, weigh-in; and

   5. Participation in a media teleconference (60 minutes),

subject always to the Fighter's reasonable prior training commitments and prior written agreement.

c. The personal appearances listed above may be for any of the following purposes:

   i. to promote the Bouts;

   ii. for the DAZN brand, and any platform, product, and services incorporating the DAZN brand related promotional, marketing, public relations, and/or media activities;

   iii. for the creation of promotional materials and media content, including by: (i) participating in photographic sessions, audio-visual recording sessions and/or film shoots for programming; (ii) giving interviews and/or participating in question and answer sessions; (iii) providing biographical and other details relevant to the fighter; and (iv) providing other opportunities for the taking and obtaining of images and footage of the fighter; and

   iv. for occasions and events of or relating to DAZN (including promotional and/or public relations events and/or film shoots for advertisements).

PRIVATE & CONFIDENTIAL

d. The process for obtaining the Fighter's approval of the personal appearances detailed above shall be as follows:

    i. DAZN shall provide the Fighter with the following information: *(i)* the proposed date, time, location of the personal appearance; and *(ii)* the proposed format of the personal appearance (including treatments, scripts, and/or storyboards, if applicable), by email to an individual appointed by the Fighter (the "Authorised Individual") at least four (4) weeks in advance of the proposed date for the personal appearance:

    ii. The Authorised Individual shall (acting reasonably) shall provide his/her approval or disapproval of the proposed personal appearance by email within forty-eight (48) hours of their receipt of the information listed in above.  If the Authorised Individual  fails to provide approval or disapproval within forty-eight (48) hours, the proposed personal appearance shall be deemed to have been approved.  If the proposed personal appearance is not approved, the Authorised Individual shall provide reasons for the disapproval and DAZN shall have the opportunity to amend the details of the proposed personal appearance and seek approval again in accordance with the above procedure.

e. Fighter is only permitted to miss an approved personal appearance if Fighter can prove he is not available to undertake the Personal Appearance due to: *(i)* professional boxing duties; *(ii)* material medical reasons; *(iii)* compliance with DAZN's instructions; *(iv)* a pre-existing commitment of the Fighter which he had communicated to DAZN prior to DAZN informing the fighter or Owner of the relevant personal appearance; or *(v)* exceptional personal circumstances which are outside of the reasonable control of the Fighter, provided in each case that Fighter has informed DAZN as soon as reasonably practicable of any such circumstances.

f. If it is necessary for the Fighter to travel by rail or air and/or to stay in a hotel or other accommodation in order to undertake any personal appearance, then DAZN shall be responsible for arranging and paying for such reasonable business class travel and/or accommodation expenses for Fighter plus one additional person.

g. Promoter shall procure that the Fighter autograph a reasonable number of items of merchandise during the Term for DAZN in accordance with DAZN's reasonable instructions, for use and exploitation by DAZN (including use and exploitation as corporate gifts, internal and external DAZN competition/promotional prizes and, subject to the prior written approval of Owner (acting reasonably), as internal and external joint DAZN/Matchroom competition/promotional prizes).

## 3.   Marketing

a. Fighter shall:

    i. Participate in one (1) eight-hour production day per Bout on a date and location to be reasonably determined by DAZN;

PRIVATE & CONFIDENTIAL

ii. Participate in two (2) four-hour production days per calendar year of the Term on a date to be mutually agreed;

iii. Except for fighter's fight shorts, include DAZN branding on fighter's apparel and equipment where relevant and possible; and

iv. Use reasonable endeavours to introduce DAZN to senior level individuals who represent Fighter's sponsors for the purpose of discussing co-marketing opportunities,

subject always to the Fighter's reasonable prior training commitments and prior written agreement.

4.     **Production**

a.  Fighter shall:

i. Provide DAZN regular access to pre-Bout camp commencing ten (10) weeks before the Bout to create content for promotion of the Bout (e.g., 24-7 and All Access);

ii. Participate in DAZN episodic original programming ahead of each Bout as reasonably requested by DAZN;

iii. Make a monthly appearance (live or via Skype) on the Ak and Barak show (or other regularly featured DAZN original programming); and

iv. Participate in pre-Bout and Bout-week shoulder content shoots as reasonably requested by DAZN,

subject always to the Fighter's reasonable prior training commitments and prior written agreement..